## 19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

### STATE OF LOUISIANA

# SEC. 25

CASE NUMBER _____ 669197 _____ SECTION _____ DIVISION _____

**K&F RESTAURANT HOLDINGS, LTD. d/b/a IZZO'S ILLEGAL BURRITO, K&F RESTAURANT HOLDINGS, LTD. d/b/a LIT PIZZA, G&O PIZZA HOLDINGS, OSVALDO FERNANDEZ, AND GARY KOVACS**

**VERSUS**

BY _____

**ROUSE'S ENTERPRISES, L.L.C., DONALD J. ROUSE, JR., DONALD J. ROUSE, SR., THOMAS B. ROUSE, ALLISON ROUSE ROYSTER, EQUITY ONE (LOUISIANA PORTFOLIO) LLC, EVT BATON ROUGE LOUISIANA, LLC, BEL COMMERCIAL, LIMITED LIABILITY COMPANY, AND NARF MANAGEMENT, L.L.C.**

FILED: _____     _____
                                                  **DEPUTY CLERK**

### PETITION FOR PRELIMINARY INJUNCTION AND FOR DAMAGES UNDER THE LOUISIANA ANTITRUST STATUTES, THE LOUISIANA UNFAIR TRADE PRACTICES AND CIVIL CONSPIRACY

This dispute arises from the Defendants' numerous conspiracies over the last several years, whose sole intent was to harm the Plaintiffs' successful burrito restaurant chain called Izzo's Illegal Burritos (Izzo's) and its recent pizza concept "LIT Pizza". The conspiracy has been carried out in violation of the Louisiana law. At this point, the continued conspiracies, the unfair trade practices of defendants and their antitrust conduct has reached a point that the plaintiffs are at a threat of irreparable damage and destruction by the deliberate intent of the literally "evil-spirited" Rouse defendants. Although the acts of the defendants are illegal and do not require a showing of irreparable damage, the plaintiffs allege, demonstrate and show irreparable damage giving immediate importance for a preliminary injunction, and eventually a permanent injunction, enjoining the defendants' illegal and hideous conduct. In fact, Rouse's should be shut down by the Attorney General for its arrogant and illegal conduct.

Parties, Jurisdiction and Venue are proper as the acts giving rise to these claims occurred in East Baton Rouge and damages have been suffered in this Parish.

REC'D C.P.

MAY 11 2018

1

**EXHIBIT A**

RECEIVED

MAY 14 2018

DIVISION O
JUDGE FIELDS



I.    **PARTIES**

    **PLAINTIFFS in this action are:**

1. **K&F Restaurant Holdings, LTD d/b/a Izzo's Illegal Burrito** (hereinafter "Izzo's") is a Texas limited partnership with its primary place of business in Baton Rouge, Louisiana;

2. **K&F Restaurant Operations, LLC** (hereinafter "K&F Operations"), is the general partner of Izzo's and a Texas limited liability company with its primary place of business in Louisiana;

3. **G&O Pizza Holdings, LTD d/b/a LIT PIZZA** (hereinafter "LIT"), a Texas limited partnership with its primary place of business is in Baton Rouge, Louisiana;

4. **G&O Restaurant Operations, LLC** (hereinafter "G&O Operations"), is the general partner of LIT and a Texas limited liability company with its primary place of business in Baton Rouge, Louisiana.;

5. **LIT PIZZA** is a Texas limited partnership with its primary place of business in Baton Rouge, Louisiana;

6. **Osvaldo Fernandez** (hereinafter "Fernandez") is a citizen of Louisiana, owning and operating the Companies that conduct business in the name of Izzo's Illegal Burrito and LIT PIZZA; and

7. **A. Gary Kovacs** (hereinafter "Kovacs"), is a citizen of the State of Texas owning and operating the Companies that conduct business in the name of IZZO's Illegal Burrito and LIT Pizza, and other affiliates.

    **DEFENDANTS in this action are:**

8. **Donald J. Rouse, Jr.** (hereinafter "Rouse, Jr."), is a citizen of Louisiana and is an owner and manager of Rouse's Enterprises d/b/a "Rouse's Supermarket."; and is an owner and manager of Rouse's Enterprises d/b/a "Rouse's Supermarket.";

9. **Donald J. Rouse, Sr.** (hereinafter "Rouse, Sr."), is a citizen of Louisiana and is an owner and manager of "Rouse's Enterprises.";

10. **Thomas B. Rouse** (hereinafter "Rouse"), is a citizen of Louisiana and is an owner and manager of Rouse's Enterprises, LLC d/b/a "Rouse's Supermarket.";

11. **Allison Rouse Royster** (hereinafter "Royster"), is a citizen of Louisiana;

12. **Rouse's Enterprises, LLC** (hereinafter "Rouse's"), is a Louisiana limited liability company with its primary place of business in Houma, Louisiana;

13. **EVT Baton Rouge, LLC** (hereinafter "EVT"), is a Louisiana limited liability company authorized to do business in this Parish and State with its primary place of business in Phoenix Arizona;

14. **EQUITY ONE (LOUISIANA PORTFOLIO) LLC**, is a Louisiana limited liability company authorized to do business in this Parish and State with its primary place of business in Jacksonville, Florida;

15. **NARF MANAGEMENT, LLC**, is a Louisiana limited liability company with its primary place of business in Thibodaux, Louisiana and is an affiliate of The Rouse's companies; and

2

16. **BEL COMMERCIAL, LIMITED LIABILITY COMPANY** is a Louisiana limited liability company with its primary place of business in Lake Charles, Louisiana.

## II.   JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction because the wrongful acts of the defendants occurred in this Parish and State and the damages have been sustained in East Baton Rouge. Likewise, Jurisdiction is proper in this Parish because the causes of action asserted herein are governed by the State Law of Louisiana. Likewise, venue is proper in this Parish because the acts giving rise to this cause of action occurred in this Parish and State, pursuant to the Louisiana Code of Civil Procedure Article 74.

## III.   BASIC FACTS AS TO ALL DEFENDANTS

18.    Izzo's is a regional restaurant chain originating at the south gates of Louisiana State University and its patrons enjoy high quality traditional Mexican themed food, particularly burritos.  LIT Pizza is a pizza concept developed by the owners of Izzo's.  Its founders are plaintiffs, Gary Kovacs and Osvaldo Fernandez.

19.    Between 2001 and at the time of the filing of this Petition, Izzo's has successfully opened seventeen restaurants throughout Louisiana and Mississippi.  However, over the past few years, up through this day, the plaintiffs have had limited opportunity to grow and develop more restaurants as they are a targeted by boycotts of the Rouse defendants and its participating developers.

### MONOPOLY POWER OF ROUSE'S

20.    Rouse's Enterprises is the largest grocery store in Louisiana. Throughout Louisiana, it has over 50 stores, generating over $1.0 billion in revenue, providing it with significant market power over all others, including developers attempting to attract businesses to their new development. Developers are the supplier of the most basic item for a restaurant, "access to space" to stores such as Rouse's and Izzo's. Without space, Rouse's does not exist. Now, the Rouse defendants have taken it upon themselves to dictate who has access to space and who does not. However, with Rouse's monopoly status in Louisiana as the largest grocery store generating over a billion dollars in revenue, the developers are susceptible to the demands, reasonable or not, of Rouse's, because new developments need a large "anchor tenant to provide the largest amount of rent than the smaller stores locating in the development. (*See* Ex. 1).

3

21.     As developers invest and develop these Malls and "strip malls" across the State of Louisiana, these developers are desirous of an "anchor" tenant who is usually a large store like Rouse's.

22.     Being a large monopolistic powerhouse in the rental market, Rouse's prepares Leases to Developers which include exclusions that specifically boycott Izzo's directly, and excluding other regional burrito concepts, without competitive justification.

23.     For years, since Rouse's was successfully able to steal Izzo's recipes, trade-secrets and logos, Rouse's has been able to conspire and coerce developers to leases with exclusions in concert with developers to exclude Izzo's, LIT Pizza, its affiliates and owners, from all developments, each such boycott creating an illegal antitrust violation. And, now Rouse's conspires with developers to attack Izzo's and any other similar regional burrito restaurant, having a direct attack on competition and commerce itself.

24.     Further, with Rouse's monopolistic power as the largest supermarket in Louisiana, Rouse's engages in restrictions with the landlord/developer. In fact, many of these developers wanted Izzo's as a tenant until Rouse's prompted them with a hefty lease.

### AFFIDAVIT OF MATTHEW MAHL

25.     In the course of Matthew Mahl's interview, Mahl disclosed his previous employment with Rouses Market and the fact that he had seen what he believed to be the Izzo's Recipe Book in the Rouses Market kitchen. (*See* Mahl Affidavit, Exhibit 2).

26.     Mahl was employed by Rouses Market from approximately May 2011 to January 2012.

27.     Mahl recalled an occasion when defendants showed him a recipe from the Izzo's Recipe Book.

28.     Mahl described the recipe book he saw at Rouses Market as a black binder with a cut-out at the top right corner of each page. Mahl understood the cut-out portion to be the portion of the document where the Izzo's logo had previously appeared.

29.     To confirm Mahl's statements, the Izzo's General Manager showed Mahl a few pages of the Izzo's Recipe Book from a distance during the course of his interview. Mahl immediately identified the Izzo's Recipe Book as identical to the black binder he had seen at Rouses Market due to the distinctive font and layout used in the Izzo's Recipe Book.

4

30.     On information and belief, a copy of the Izzo's Recipe Book remains on the shelf of the Rouses Market kitchen.

## AFFIDAVIT OF PATRICK DARTEZ

### The Scheme to Bribe Izzo's Employee to Steal its Secret Recipe Book

31.     In September of 2011, Rouse's Director of Perishables, Jack Treuting, called Fernandez and stated that Rouse's was very impressed with Izzo's' products.  Specifically, Treuting stated that Rouse's was interested in franchising Izzo's in all their grocery stores because Rouse's offers pre-cooked, ready to eat food in its deli.  Izzo's politely declined their proposal.

32.     Rouse Jr., who manages the company, responded by forming a scheme to steal Izzo's burrito recipes so that Rouses could offer similar burritos in the deli sections of its stores.  Rouse directed some of his store managers in Lafayette to surreptitiously approach one of Izzo's former managers, Patrick Dartez, with an offer to defect to Rouse's with Izzo's recipes.  (*See* Ex. 3).  Dartez received special training and practices on cooking and prepping food for Burritos.

33.     Dartez's employment contract with Izzo's required that he keep all Izzo's training, policies, preparation and especially the Izzo's Recipe Book confidential.  Dartez admits that he did not return the Izzo's confidential information, particularly Izzo's Recipe Book. (*See* Ex. 3).  Rouse Jr., his family and his employees (conspirators) offered/bribed Patrick Dartez, the manager of the Izzo's Lafayette store in 2011.  This was done despite Dartez's employment contract with Izzo's which required him to keep the recipes secret.  Dartez accepted the job-offer, a management position, essentially as a bribe, to steal Izzo's recipes and bring them to Rouse's. Treuting and Rouse's knew that Dartez had the expertise that he learned from Izzo's and that he had the Recipe Book from Izzo's with its trade-secret Recipes.

34.     Dartez starts the Burrito Bar at Rouse's was based upon the specialized skills, training and recipes that he learned from Izzo's.  "Accordingly, I set up the Burrito Bar [at Rouses] based upon the special training, knowledge, experience and Recipe Book from Izzo's.  Rouse's then began to offer burritos at its deli departments in some of its stores.  They were very similar, if not identical, to Izzo's and relied upon Izzo's secret recipes from the purloined recipe book. (*See* Ex. 3).

35.     **This conspiracy between Rouse Jr., his employees and Dartez violated La. Stat. Ann. § 14:73 (Commercial Bribery), which prohibits: [T]he giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee,**

5

or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs.

36.     Rouse's has continued to open burrito stations in many of its stores throughout Louisiana using Izzo's proprietary secrets. Donny Rouse, Jr. is personally familiar with the fact that Rouse's uses Izzo's Recipe Book as well as other restaurants' recipe books.

### Testimony of Jack Treuting.

37.     Jack Treuting was formerly the Director of Perishables for Rouse's in Lafayette. Donny Rouse, Jr. was interested in locating Izzo's Illegal Burrito Bars in the Rouse's store. Jack Treuting admits making a call to Izzo's inquiring about placing an Izzo's Franchises in Rouse's stores.

38.     Izzo's declined Rouse's request to allow Rouse's to place Izzo's in Rouse's stores.

39.     However, Rouse's was still determined to use Izzo's recipe's and concepts in building a Burrito Bar in its Lafayette store, and eventually other stores as well.

40.     Jack Treuting sought out Patrick Dartez, when he learned Dartez was a former manager of Izzo's Illegal Burrito, and Dartez remembered the methods of cooking, the specialty methods of prepping food, and Dartez still had an Izzo's Recipe Book and other papers from Izzo's, which Treuting and Rouse were aware of.

41.     On behalf of Rouse's, Treuting offered Patrick Dartez a managerial job in the Deli to build the Burrito Bar in Rouses using his specialized knowledge, training, experience and Izzo's Recipe Book.

42.     Patrick Dartez did successfully complete the Burrito Bar in Rouse's in Lafayette.

43.     Rouse's used a slogan "Build you Own," substantially similar to Izzo's "Roll Your Own" in order to make its logos appear to be substantially similar and confusing in the market.

44.     Treuting also had a recipe book for Whole Foods in the Deli Department at that time.

45.     According to Treuting and others, Donny Rouse, Jr. has a bad temper and is often hard to deal with. At all times relent hereto, Donny Rouse, Jr. was well aware of the use of other restaurants' recipe books.

46.     When Izzo's found Izzo's Recipe Book at the Rouse's store in Lafayette, Donny Rouse, Jr. became embarrassed and enraged at Izzo's, such that he became determined to stop Izzo's business and growth.

47.    The Izzo's Recipe Book was behind the counter for any employee to use. There were occasions that I used the Izzo's Recipe Book to teach employees how to cook certain products.

48.    At all times, I, Jack Treuting was acting as Director of Perishable for Rouse's and I had full knowledge of the use and presence of the Izzo's Recipe Book money of Jack Treuting formerly with Rouse's

49.    As stated, Izzo's burrito recipes are closely-guarded trade secrets. Rouse Jr. has caused Rouses to continue to possess and use these trade secrets since 2011 to this very date, constituting a continuous tort. The Rouse's defendants previously lied to their lawyers who specifically represented that Izzo's recipes were not used by Rouse's. This illegal activity is ongoing and will not halt without judicial intervention, such as a Preliminary Injunction.

50.    As stated, Izzo's burrito recipes are closely-guarded trade secrets. Rouse Jr. has caused Rouses to continue to possess and use these trade secrets since 2011. This illegal activity is ongoing and will not halt without judicial intervention.

51.    **This violates La. Rev. Stat. 51:121, which state, in pertinent part:**
   **(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly-**
   **(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization....or**
   **(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy, §1427.  Unfair or deceptive trade practices or acts; stolen or misappropriated computer software; violations**
   **A.  It shall be unlawful for a person to develop or manufacture a product, or to develop or supply a service using stolen or misappropriated property, including but not limited to computer software that does not have the necessary copyright licenses, where that product or service is sold or offered for sale in competition with those doing business in this state.**
   **B.  Any violation of this Section shall be an unfair method of competition and unfair practice or act and shall subject the violator to any and all actions and penalties provided for in this Chapter.  For the purpose of this Section, a violation shall occur each time such a product or service is sold or offered for sale.**

52.    After Izzo's caught Rouse's red-handed with Izzo's Recipe Book behind Rouse's counter, Rouse's was humiliated and outraged with Izzo's and determined to harm Izzo's, and its owners, in any and every way possible.

53.    Rouse's has lied about the background facts on numerous occasions. First, Rouse's told its lawyers, who then told Izzo's, that Rouse's was unaware of the Izzo's Recipe Book being used to create the Rouse's Burrito Bar. Rouse's claims that it was surprised to learn of the Izzo's Recipe

7

Book and immediately fired the former Izzo's manager. However, according to Dartez, Treuting and Mahl, Rouse's sought out Dartez because he possessed the expertise, skills, training and Izzo's Recipe Book. Clearly, Rouse's schemed to hire an Izzo's burrito manager, with all of Izzo's proprietary data, to unlawfully use Izzo's trade secrets and to gain unfair competition against Izzo's. Rouse's admits in Document 13, page 2, line 11, that getting caught with the Izzo's Recipe Book caused it "great embarrassment" and it fired Dartez. However, according to Dartez, his offer of employment as Deli Manager was because he possessed Izzo's confidential information. Accordingly, Rouse's firing of Dartez was to make Dartez the scapegoat of Rouse's illegal conduct and theft of trade secrets. In reality, Rouse, Jr. and Rouse's developed a great hatred towards Izzo's and the start of a vindictive trade war by Rouse's against Izzo's, its owners, and any other concept created by the Izzo's owners.

### ROUSE'S AND DEVELOPERS' Conspiracies to Boycott Izzos, its affiliates, its owners, And Any Regional Burrito Restaurant

54.    Izzo's signed a Letter of Intent with Juban Crossing to locate an Izzo's Burrito Restaurant in the new Juban development.  However, after Izzo's secured its Letter of Intent, Rouse's approached the developer, Juban and Scott Keller. Rouse's offered to be the anchor tenant to Juban if Juban and Keller conspired to a boycott of Izzo's Illegal Burrito Restaurant. After Rouse's, Juban and Keller agreed to exclude Izzo's, Juban gave Izzo's the "silent treatment" and never told Izzo's about the exclusion.  Sometime in late May of 2015, Izzo's discovered that Rouse's had included this boycott restriction in its lease with Juban and Keller. As a direct consequence, Rouse's blocked all of Izzo's concepts from Juban.

55.    To make matters worse, Rouse's told Juban that it had no objection to Juban giving Izzo's' location to another burrito concept, Moe's Southwest Grill.

### PATTERN AND PRACTICE OF ANTICOMPETITIVE CONDUCT BY ROUSE'S

56.    Over the course of May and June of 2015, Izzo's' owners learned that Rouse's had used its Monopoly power in the grocery market to exclude Izzo's, its affiliates and its owners from Juban Crossing, Long Farms, Berryland and a Lafayette development.  Suit has been filed in the Middle District of Louisiana regarding the Rouse's and developers' boycott of Izzo's, its affiliates and its owners. In fact, Izzo's owners', Kovacs and Fernandez, have created a new restaurant concept,

LIT Pizza. Consequently, the developers have agreed to exclude the LIT Pizza concept from their developments, as well as Izzo's, all in combination and conspiracy with the Rouse defendants.

57.     More recently, Rouse's has entered into a lease (*See* Ex. 4) with defendant, EQUITY ONE (LOUISIANA PORTFOLIO) LLC, a Florida limited liability company, dated May 16, 2017, whereby Rouse's and EQUITY ONE have conspired to boycott "(t) Any Izzo's Illegal restaurant." This conduct by and between Rouse's and EQUITY ONE creates vertical and horizontal restraints of trade by depriving the Plaintiffs of space required to open new restaurants in these new developments. These vertical and horizontal restraints cause damage to both the Plaintiffs and to competition in general, because Rouse's is using its monopoly power to dictate who can and cannot do business in Louisiana, and, so far, Rouse's has been successful.

58.     Rouse's attack on Izzo's and competition in general, is made most clear in another recent lease agreement with defendant EVT BATON ROUGE LOUISIANA, LLC, a Louisiana limited liability company, dated July 28, 2017, wherein Rouse's agreed and conspired with defendant, EVT, to boycott **"(W) Any regional burrito concept (except with the written permission of Rouses)."** (*See* Ex 5). This language shows that Rouse's is using its Monopoly power to dictate who is acceptable and who is not acceptable. In fact, Izzo's is the only Regional Burrito Restaurant. However, there are two local burrito restaurants like Felipe's and Juan's Flying Burrito which could gain access to space in the new development upon the agreement of Rouse's. Hence, the facts clearly show that Rouse's, as the largest grocer in Louisiana, is using its Monopoly power to boycott a competing business, Izzo's Illegal Burrito, as well as any restaurant concept created by the powers of Izzo's, such as LIT Pizza.

57.     At all times relevant hereto, defendants, EVT, Equity One, and Bel Commercial, Limited liability Company wrongfully conspired with the Rouse's defendants in such a manner that created vertical and horizontal constraints of trade in violation of Louisiana wrongful conspiracy law, antitrust laws and Louisiana Unfair Trade Practice Act.

58.     As a direct result of the defendants' Rouse's, EVT, Equity One, Narf Management, LLC and Bel Commercial, Limited liability Company illegal, unethical and unfair trade practices and conspiracies, they are liable jointly, severally, and in solido liable to the plaintiffs for all damages suffered by the plaintiffs for the cause of action set forth herein.

**COUNT I – Louisiana Unfair Trade Practices Act Against all defendants**

59.    Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60.    Plaintiffs allege that the Rouse's defendants, EVT, Equity One, Narf Management, LLC and Bel Commercial, Limited liability Company, have violated the Louisiana Unfair Trade Practices Act. Plaintiffs reincorporate all statements, claims, rights, causes of action and factual allegations stated above as if copied herein in extension. Specifically, the plaintiffs assert that the combination of behavior from stealing trade secrets, recipes, trademarks, creating a burrito bar with plaintiffs' concepts and recipes, selling burritos to the public under the Rouse's name, bribing plaintiffs' employee to breach his oath of confidentiality to create this burrito bar, then, to use its sheer power and magnitude as the largest grocer in the State, to ultimately enter into lease agreements that boycott Izzo's, its affiliates and owners, is tantamount to removing the owners of Izzo's from commerce in Louisiana, and constitutes a clear violation of the Louisiana Unfair Trade Practices Act.

61.    The Louisiana Unfair Trade practices Act provides that "Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages."

62.    Further, if the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the Louisiana Attorney General, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs. Upon a finding by the court that an action under this Section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney fees and costs.

63.    Plaintiff shows that the Rouse's defendants have been duly served with notice by the Louisiana Attorney General of the seriousness of the defendants' actions, yet the defendants continue to act in a manner that is immoral, illegal, unethical and unfair to the plaintiffs, and that as a direct result of the behavior outlined in detail above, the Plaintiffs have suffered by a stall in its growth, the lack of new stores, loss of goodwill, and the loss of revenues and profits. Plaintiffs

are persons entitled to sue under the LUTPA; Plaintiffs have articulated in great and specific detail the unfair trade practices of the defendants; and the plaintiffs have suffered losses as a result of the defendants' violations of the LUTPA.

64.    **LUPTA Provides for Injunctive Relief**

**La. Rev. Stat. 51:1405. Unfair acts or practices; interpretation and rulemaking authority**

> **A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.**
>
> **§1408 Additional relief**

**A. The court may issue such additional orders or render judgments against any party, as may be necessary to compensate any aggrieved person for any property, movable or immovable, corporeal or incorporeal, which may have been acquired from such person by means of any method, act, or practice declared unlawful by R.S. 51:1405, whichever may be applicable to that party under R.S. 51:1418. Such orders shall include but not be limited to the following:**

> **(1) Revocation, forfeiture, or suspension of any license, charter, franchise, certificate, or other evidence of authority of any person to do business in the state.**
>
> **(2) Appointment of a receiver.**
>
> **(3) Dissolution of domestic corporations or associations.**
>
> **(4) Suspension or termination of the right of foreign corporations or associations to do business in this state.**
>
> **(5) Restitution.**

**B. Unless otherwise expressly provided, the remedies or penalties provided by this Chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state.**

> **§1409 Private actions by plaintiffs against defendants.**
>
> **La. Rev. Stat. 51:1409 – Private parties have a Right of Action Against Violators of The Louisiana Unfair Trade Practices Act**

**A. <u>Any person who suffers any ascertainable loss of money</u> or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an <u>unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may</u> bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs. Upon a finding by the court that an action under this Section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney fees and costs.**

B. Upon commencement of any action brought under Subsection A of this Section, the plaintiff's attorney shall mail a copy of the petition to the attorney general, and, upon entry of any judgment or decree in the action, shall mail a copy of such judgment or decree to the attorney general, but failure to conform with this Subsection shall not affect any of plaintiff's rights under this Section.

C. Any permanent injunction, judgment or order of the court made under R.S. 51:1407 and R.S. 51:1408 shall be prima facie evidence in an action brought under R.S. 51:1409 that the respondent used or employed a method, act or practice declared unlawful by R.S. 51:1405 or by rule or regulation promulgated pursuant thereto; provided, however, that this subsection shall not apply to consent orders or voluntary assurances of compliance.

D. If any person is enjoined from the use of any method, act, or practice or enters into a voluntary compliance agreement accepted by the attorney general under the provisions of this Chapter, such person shall have a right of action to enjoin competing businesses engaged in like practices.

65.     The plaintiffs have suffered and continue to suffer economic and goodwill damages:

1)     By the continued actions and boycotts by Rouses:

2)     By Rouse's bribery of an Izzo's employee with the intent to have that employee violate his Confidentiality Agreement with plaintiffs;

3)     By Rouse's continued use of Izzo's recipes and trademarks and logos;

4)     By Rouse's continual denial of its use of Izzo's recipes in light of Patrick Dartez's and Matthew Mahl's sworn testimony;

5)     By Rouse's product defamation by telling developers that Izzo's sells substandard food products;

6)     By Rouse's presenting its burritos as its own, when, in fact, it is based off Izzo's Recipe Book and cooking methods, but does not meet Izzo's high quality standards;

7)     By Rouse's continued lies to developers that plaintiffs are "litigious," when Izzo's had never filed a lawsuit until it sought to recover, and did recover, its recipe book from Rouse's in Lafayette; (*See* Ex. 6 & 7).

8)     By Rouse's continued insistence that Izzo's, its affiliates and its owners be boycotted from new developments all around Louisiana;

9)     By attacking commerce in general by imposing a restriction to boycott any and all regional burrito stores (without Rouse's prior approval);

10)     By Rouse's representations to developers that Izzo's sells substandard product;

11)     By Rouse's use of Izzo's trade secrets and trade mark "Roll It Good', or a substantially similar logo of "Build Your Own.".

12)     Having alleged and shown that the plaintiffs have suffered as a result of the defendants   engaging in violations of the commercial bribery statutes and theft of trade secrets acts making the plaintiffs entitled to enforce this provision against all of the defendants;

12

13)    And any other act of deception, misrepresentation, or of unethical nature or immoral nature which may be proven at a trial of this matter.

66.    As detailed above, Rouse Jr. conspired to commit multiple illegal conspiracies against Izzo's. These violations began in 2011 and are ongoing, as the use of Izzo's trade secrets continues unabated at Rouse Jr.'s direction. Accordingly, Rouse Jr. has violated the law by agreeing to violate the Louisiana Unfair Trade Practices Act. All three were committed through Rouses Enterprises LLC, of which he is an officer. Rouses Enterprises LLC conduct affects intrastate commerce. Armed with Izzo's trade secrets, and specialized knowledge of making the ultimate burrito, Rouse's decided to violate the Antitrust laws of the State of Louisiana. This Court has jurisdiction to enter a Restraining Order and/or Injunction on the Unfair Trade Practices Act under this Section.

67.    Wherefore, Izzo's demands judgment be entered against Rouse Jr. for an amount equal to its damages caused by the LUTPA violations described above as the Scheme to Exclude Izzo's from EVT, Equity One, and Bel Commercial, Limited liability Company. Rouse's act of wire fraud committed to further that scheme damaged Izzo's in considerable lost profits, and costs, attorney's fees, and pre-judgment interest pursuant to LUTPA. Izzo's also seeks an injunction against Rouse Jr. to prevent any further unfair trade practices and antitrust activity intended to damage its business or future expansion plans.

68.    All plaintiffs, including, but not limited to, Izzo's and LIT Pizza, have been damaged by the conspiracies of Rouse's, EVT, Equity One, and Bel Commercial, Limited liability Company, and its agents, and its co-conspirators.

**La. Rev. Stat. 51§1427 – Unfair or deceptive trade practices or acts; stolen or misappropriated computer software; violations**

**A. It shall be unlawful for a person to develop or manufacture a product, or to develop or supply a service using stolen or misappropriated property, including but not limited to computer software that does not have the necessary copyright licenses, where that product or service is sold or offered for sale in competition with those doing business in this state.**

**B. Any violation of this Section shall be an unfair method of competition and unfair practice or act and shall subject the violator to any and all actions and penalties provided for in this Chapter. For the purpose of this Section, a violation shall occur each time such a product or service is sold or offered for sale.**

13

**Rouse's Exercises its Monopoly Power in Bad Faith to Stop Competitions and
Growth of its Competitors and Antitrust Behavior**

69.     As discussed earlier, Rouse's is the largest grocery store in Louisiana and generates over $1.0 Billion in Revenue annually.  Moreover, Rouse's continues to buy out small "mom and pop" grocers around the State of Louisiana.

70.     While Rouse's enjoys the fruits and revenues of expanding into new territories and growing its business, Rouse's has allowed its ill will, malice and vindictive outrage to damage Izzo's, LIT Pizza, and any affiliates and their owners by denying them access to free trade and commerce.

71.     Specifically, Rouse's has entered into a number of leases prohibiting developers and land owners from Leasing property to Izzo's, LIT Pizza, its affiliates and its owners.  Prior to this Lawsuit, Rouse's entered into leases with Juban, after Juban had already sought out and granted a Letter of Intent to Izzo's. Likewise, Rouse's entered into leases with Mosely Holdings, Victory and Berryland, which said leases are part of a lawsuit pending in the Middle District of Louisiana, Case No. 16-293, *K&F Restaurant Holdings, Ltd., et al v. Donald J. Rouse, Jr., et al.*

72.     In the federal case, the Rouse defendants were served with Notice from the Attorney General that they were being sued under the Louisiana Unfair Trade Practices Act.

73.     Rouse's has used its Monopoly Power and high-power leverage to prohibit developers, who otherwise would want regional concepts like Izzo's and LIT Pizza, from entering into leases with Izzo's and LIT Pizza.

74.     In Rouse's' leases, they contain a provision that prohibits the lease or sale of property to Izzo's, its affiliates and its owners, causing extreme damage to the plaintiffs.

75.     Rouse's has created a classic vertical restriction prohibiting the provider of store space/land for Izzo's and LIT Pizza to Rouse's competitors without justification.

76.     Likewise, Rouse's has created a classic horizontal restriction in the market buy using its size and power to bar entry to the market and development by Izzo's and LIT Pizza.

77.     These types of vertical and horizontal restraints are illegal per se because they stop healthy competition.

**COUNT II - Complaint for Louisiana Antitrust Laws, Unfair Practices, and Unfair Competition as to All Defendants**

78.    Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1 through 77 as if fully set forth herein.

79.    Plaintiffs bring this action for treble damages and injunctive relief for violations of Louisiana law.

80.    The Market is Precooked Retail Food Sales, such as burritos and pizza, and the Region is Louisiana.

81.    In the United States, the most prevalent means for acquiring food is by purchasing food products for cooking or purchasing pre-cooked food products, ready to eat. The two types of retail food services are by grocers or restaurants. Grocers sell both foods for being cooked and pre-cooked foods, while restaurants primarily focus on pre-cooked food, ready to eat.

82.    Access to food sources is an absolute necessity for life and grocers and restaurants are the primary sources used throughout the United States.

83.    There are several levels of food distribution. First, the source of food is farmers for all products, then wholesale or distributors who buy food from farmers and facilitate delivery of food from farmers to grocers and restaurants. Plaintiffs are retail sellers of pre-cooked food of various concepts and a distributor.

84.    Defendant, **Rouse's**, is the largest grocer in Louisiana. It sells food for cooking **and pre-cooked foods including burritos and pizzas**. Defendant has a deli/food court with varieties of pre-cooked food, including but not limited to burritos and pizzas.

85.    Defendant, Rouse's, is a competitor of Plaintiffs as it sells pre-cooked foods (e.g., burritos, pizzas, etc.) to consumers in the same geographic markets.

Retail Food Products Market

86.    Commerce in retail food products is substantial and affects interstate commerce. There are many different product markets for retail food as described below. The markets consist of those for retail food distributions to consumers. Thus, the many product markets such as:

(i)     sale of food for cooking;

(ii)    the sale of partially prepared food which simply requires heating;

(iii)   the sale of pre-cooked food, ready to eat;

(iv)    the sale of pre-cooked food concentration on one type of food;

15

(v)     the sale of pre-cooked food with a variety of types of food; and

(vi)    the combination of selling un-cooked food requiring preparation and cooking along with pre-cooked foods, ready to eat.

87.   The relevant geographic markets for retail food sales is:

(i)     Louisiana; and

(ii)    The product and geographic markets set forth above are referred to herein as the "Market Area" is Louisiana.

88.   The Market Area, more so in Louisiana, is highly concentrated by one grocer, Rouse's Enterprises, which continues to grow at a speed in almost every new development in Louisiana. Rouse's is the largest grocer in Louisiana and continues growing by purchasing smaller grocers. It has over 50 stores in Louisiana and generates over $1 Billion Dollars.

89.   Barriers to entry into the Market Area are high. The high concentration in the Market Area, the sophisticated technology, large expenses, high capital costs, relationship with farmers and wholesalers supports its growth and the conduct of Rouse's is more particularly described herein, all make it difficult for new firms to enter the Market Area.

**COUNT III – Louisiana Antitrust Conduct as to all Defendants**

90.   Plaintiffs reallege and re-aver all allegations, claims, statements of fact and causes set forth in Paragraphs 1 through 89 as if fully repeated herein. See *Southern Tool & Supply, Inc. v. Beerman Precision, Inc.*, et al, (La.App.4[th] 11/26/2003); 862 So.2d 271.

91.   Plaintiffs allege that Defendants have engaged in the anticompetitive conduct alleged above as well as the Refusal to Deal - Also known as Illegal Boycotting of a Business.

92.   Rouse's continues aggressive growth by acquiring smaller grocers in as many cities as possible.  Additionally, Rouse's seeks out new land and developments to build new stores demanding that sellers and lessors who do business with Rouse's must boycott and exclude Izzo's, LIT Pizza and their owners.

93.   Rouse's contains high leverage with developers, sellers and lessors due to its large zone. Rouse's leverage allows it to dictate or demand illegal restrictions on developers, sellers and lessors such that Rouse's has conspired with numerous developers, sellers and lessors to exclude and group boycott retail food sellers like Izzo's, LIT Pizza and any other retail food concept affiliated with Plaintiffs, including competition in general, by excluding any regional burrito restaurant.

94.  Defendants have successfully conspired to prevent developers, sellers and lessors from leasing or selling retail space to Plaintiffs.

95.  In each sales territory, Defendant sells its products designed for retail food sales "to be cooked" and pre-cooked and ready to eat.  The result is that Defendant has exclusive presence in every territory in which it sells and boycotts the Plaintiffs.

### Rouse Defendants Collusion with Other Developers, EVT, EQUITY ONE, and BEL COMMERCIAL LIMITED LIABILITY COMPANY

96.  Rouse Defendants have engaged in collusive behavior with developers, sellers and lessors to expressly deny retail space to any food concept of Izzo's, LIT Pizza or their owners.

97.  The Market Area has several characteristics which indicate and facilitate collusive behavior in price setting.  There is efficient price monitoring in the Market Area, and the Market Area is characterized by the existence of pervasive information exchange.  Producer price lists are widely circulated and commonly available to buyers as well as to competing producers.  Producers are able to learn about price announcements of competitors well in advance of their actual implementation.  Other firms follow prices announced by the Defendants.

98.  Other factors facilitate collusive behavior as well.  Demand for retail food services by consumers is inelastic.  In other words, a rise in the price of retail food services does not cause consumers to decrease their use and need of retail food services significantly.  People need food.  Thus, it is easier for grocers and wholesalers to set product prices collusively.  The retail food service industry is also characterized by high fixed cost and slow growth, factors which tend to make the possibility of collusive behavior more likely.  Thus, the structure of the Market Area facilitates collusive behavior in price setting and customer allocation.

99.  Rouse's is the largest grocer in Louisiana.  Their Market share exceeds any other grocer in Louisiana giving them monopoly power over distributors, competitors and every other participant in the market. They boast generating over $1 Billion in revenues.

100.  Defendants have monopolized the Market Area in that it has power to dictate tenants of its preference and exclude competition in some or all of the Market Area.  This is proven in that Rouse's has now conspired with over 10 developers, or more, to boycott Izzo's Illegal burrito and its affiliates and owners.  Defendants have acquired, exercised, and maintained its monopoly power willfully and intentionally by way of the acts set forth above.

17

101.   Defendants have also intentionally and willfully attempted to monopolize some or all of the Market Area by way of the aforementioned acts.   There is a dangerous probability that Defendants' attempts to monopolize some or all of the Market Area will be successful, as more smaller grocers are bought by defendant Rouse's, or forced to closed in a price battle with Rouse's.

102.   Defendants have also intentionally and willfully conspired to monopolize the Market Area by way of the acts set forth above.   A substantial amount of commerce has been affected by the conspiracy to monopolize.

103.   As a direct and proximate result of the aforementioned conduct, Plaintiffs have been injured in their businesses.   Plaintiffs have been deprived of the benefit of free competition in some or all of the Market Area.   Plaintiffs have been injured by Defendants' and its co-conspirators by refusal to deal with them and have incurred increased costs and decreased profits as well as total exclusion in several markets, loss of revenue and loss of goodwill.

104.   As a direct and proximate result of the aforementioned conduct, Plaintiffs have suffered actual damages in an amount to be determined at trial including, inter alia, loss of revenue, and increased operating costs, loss of good will, loss of market share and other losses.

Defendants' Antitrust Behavior is Both Vertical and Horizontal.

105.   By engaging in the acts and conduct described above, Defendants have engaged in unfair competition in violation of the Louisiana Unfair Trade Practices Act and the Louisiana Antitrust Law, civil conspiracies, theft of trade secrets and infringement of trademarks.

106.   In violation of La. Rev. Stat. 51:122, et seq. provide that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal." Every contract or conspiracy in restraint of trade or commerce in this state is illegal.

107.   The federal and state antitrust laws were intended to be sweeping in breadth, encompassing every conspiracy, contract, or combination that restrains trade. *La. Power & Light Co. v. United Gas Pipeline*, 493 So.2d 1149, 1154-55, n.12 (La. 1986).   Here, there has been an attack on the plaintiffs and an attack on competition as set forth in ¶¶ 70-98. This Court cannot ignore the fact that Rouse's has created both horizontal and vertical restraints by conspiring with multiple developments. Although, each developer claims innocence, this Court is permitted to and should consider the aggregate effect of the multiple agreements that eliminate Izzo's and LIT Pizza from

18

several developments, not just one. The effect is that competition is affected, as well as defendants. Specifically, if Izzo's and LIT Pizza were allowed in these 3 new developments owned by EVT, EQUITY ONE, and Bel Commercial, Limited Liability Company that would create additional stores for consumers and promote competition in the market.  However, with the multiple horizontal and vertical restraints created by Rouse's and the developers, there are no Izzo's and no LIT Pizza locations in those developments.  There cannot be a dispute that the aggregate effect of the multiple vertical and horizontal restraints are violations of the antitrust laws.

108.   Step 1 in determining an antitrust claim in restraint of trade is to determine whether or not it should be categorized as horizontal or vertical. Id. Horizontal conspiracies are agreements between competitors that retrains trade at the same level of distribution and are considered "per se' violations of the antitrust laws. *Plaquemines Marine, Inc. v. Mercury Marine*, 2003-1036 (La. App. 1 Cir. 7/25/03) 859 So.2d 110.  A vertical restraint is imposed by persons at different levels of distribution, usually by one higher up in the distribution chain than the party restrained. When a vertical restraint is alleged, the plaintiffs' must show the restraint of trade violates the "rule of reason." *Plaquemines Marine*, 859 So.2d at 118.

109.   The "rule of reason" analysis under both the federal and state law requires proof of the three elements: 1) that the defendants engaged in a conspiracy; 2) that the defendants' conspiracy restrained trade or injured competition; and 3) in a particular market. *Abraham v. Richland Parish Hospital*, Case, No 41,141 (La.App, 2d Cir. 8/23/06) 938 So.2d 116, 117, writ denied, 2006-2534 (La. 1/8/07).  In the present case, Rouse's used its size and leverage to create both horizontal and vertical conspiracies in restraint of trade, which is exactly what the antitrust laws are created to prevent.

110.   Where the vertical conspiracy is not related to price fixing, the plaintiffs must show through the rule of reason that the defendants' conduct has an adverse effect of competition. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001,1005 (5th Cir.) cert. denied, 454 U.S. 8.27. (1981). The plaintiffs must define the geographic market, meaning the relevant area create effected by the restraints on trade and areas where competition is affected and where the defendants operate.

111.   Second, the plaintiffs must allege the product market and the geographic market for the product market.  For the product element, the relevant market consists of those goods which are reasonably interchangeable for the purposes for which they are produced, taking into account price,

19

use and quality. The geographic region element consists of the area in which sellers of the defendants' products operate, and to which buyers can practically turn to obtain that product.

112.    In this case, the plaintiffs allege all of the facts necessary and relevant to the antitrust law under state law.  Specifically, it is undisputed that Rouse's entered into multiple contracts and conspiracies with shopping center developers who sell and provide space to grocers and restaurants. Because the conspiracies and contracts are between Rouse's and the other defendants/developers, they are not on the same level, so here the plaintiffs allege a vertical level conspiracy between Rouse's and the developers. Developers are necessary because they provide the space that grocers and restaurants need to open stores and conduct business.

113.    Rouse's is the largest grocery store chain in Louisiana and possesses the largest market share among grocers, (which sells much more than groceries). As the largest grocer in Louisiana, Rouse's has a monopoly over other grocers, in that it can set prices at its choosing, it can buy land for new stores and it can lease from anyone whom it wishes. This monopoly power exists throughout Louisiana. Rouse's has no barriers of entry to the grocery business.

114.    On the contrary, opening a grocery store has a high level of barriers to entry, but not for Rouse's. Rouse's has acquired dozens of stores to become the most powerful player in the market. Consequently, Plaintiffs alleged that Rouse's possesses monopoly power in the retail food market in the Region of Louisiana. Rouse's has the power to dictate unreasonable, unilateral and anticompetitive terms to developers because of its sheer size and monopoly power. Some of Rouse's lease exclusions and deed restrictions have proven to be anticompetitive, unreasonably targeted at one competitor with no procompetitive effect.

115.    Rouse's does not and cannot deny the conspiracies because they were reduced to writing in leases and deed restrictions. Izzo's and Lit Pizza are Louisiana based companies with a desire to grow and open new stores.  However, Rouses has freely opened stores across the State and Rouse's has made it a priority and practice to exclude Izzo's, its affiliates and its owners.

116.    Leases and deed restrictions can be found across Louisiana barring Izzo's and its affiliates from entry while Rouse's enjoys all the growth its wants by virtue of its monopoly. Consequently, Izzo's has suffered from these illegal exclusions. Likewise, competition, in general, has been damaged because customers cannot find Izzo's or Lit Pizza. In the age of technology and consumers use their electronic devices and navigational devices to find nearby restaurant options,

they will not be able to find a nearby Izzo's directly due to Rouse's. restrictions. There cannot be any argument that damages have occurred to the market, consumers and the Izzo's plaintiffs.

117.    Accordingly, the first two elements of the antitrust laws are satisfactorily alleged. Within the retail food service business, businesses sell foods to cook and pre-cooked foods. Rouse's and Izzo's and LIT Pizza directly compete with one another in the retail sale of pre-cooked, ready to eat food. In the retail food service market, consumers can buy food to cook or buy pre-cooked meals. Based upon particular consumers' needs, they can choose to buy food to cook or buy pre-cooked food, ready to eat, or only to be heated.

118.    Defendants engaged in concerted activity as part of a conspiracy to prevent full and fair competition in the relevant market. Upon information and belief, each of the anticompetitive actions described in this complaint were taken pursuant to an illegal agreement by and among the Defendants. The unlawful agreements are evidenced by, among other things, the leases, the deed, the economic interests of Defendants Rouse's, EVT, EQUITY ONE, Narf Management, LLC and Bel Commercial, Limited Liability Company; the close relationships among Defendants; Defendants' concerns about the competitive threat that Izzo's application posed to the Defendants; the history and anticompetitive practices of Rouse's; and the timing of various anticompetitive actions taken by Rouse's, EVT, EQUITY ONE, Narf Management, LLC and Bel Commercial, Limited Liability Company.

119.    Pursuant to their conspiracies and unlawful agreements, Defendants have engaged in per se anticompetitive behavior, or, alternatively, with pure malice and ill-will, anticompetitive behavior without procompetitive justification, that has unreasonably retrained trade in violation of Louisiana Antitrust Law La. R.S. 51:122. Likewise, they violated the rule of reason, this anticompetitive behavior includes but is not limited to:

(i)      buying or leasing properties from developers upon the condition that developers would not sell or lease, nor allow to be sold or allow to be leased to any property by Izzo's, K & F Restaurants, its individual owners and any new food concept;

(ii)     entering into leases with restrictions that lessors or developers will not sell or lease any space for any retail food concepts created by the owners of Izzo's, LIT Pizza or any other food concept of Plaintiffs;

(iii)    expanding its retail food sales into new areas and developments containing the exclusion of any retail food concept by Izzo's, LIT Pizza or their owners;

21

(iv)     conspiring to restrict plaintiffs' entry into highly desirable development markets inside and outside Baton Rouge, Livingston, Lafayette, Lake Charles and Calcashiue; and

(v)     proposing, after secret drafting that excluded relevant stakeholders and even one Rouse's member, additional or developers and lessors rules specifically targeting Izzo's, LIT Pizza, and all retail food concepts created by the owners of same;

(vi)  Speaking derogatorily of Izzo's calling it Litigious and filing baseless lawsuits'

(vii) Bribing an Izzo's employee to break his contract with Izzo's; and

(viii)  using mail fraud and wire fraud to facilitate these illegal agreements.

120.    This anticompetitive behavior substantially affects intrastate commerce.  As just one example, throughout Louisiana's border of the Rouse's reach is coterminous with the Southeast Louisiana border, and on a daily basis the anticompetitive behavior prevents would-be consumers from buying Izzo's and LIT Pizza and request stores across this state line for business or retail purposes.

121.    Defendants' concerted action has prevented Izzo's, LIT Pizza and all food concept of its owners from participating in the relevant market and has prevented consumers from providing or using plaintiffs' services involving Izzo's, LIT Pizza and all food concept of its owners in the relevant market. Under the current arrangement, the owners of Izzo's are prohibited from opening a clothing store in these developments where Rouse's has demanded these illegal exclusions

122.    Defendants' conduct has damaged competition in the relevant market, dictating prices and reducing competition for retail food services, all to the detriment of consumers and Plaintiffs in the relevant market.  For example, Izzo's, LIT Pizza and all food concepts of its owners have lost revenue that they otherwise would have generated by participating in the relevant market, and consumers in these cities and parishes have paid higher prices for retail food services than they would have but for Rouse's anticompetitive conduct.

123.    None of Defendants' anticompetitive practices were reasonably necessary for the proper functioning of the retail food service market in these cities and parishes, and throughout Louisiana for that matter. Any benefits that Defendants claim are achieved by these undue restraints of trade can be accomplished by means that are less harmful to competition.  Even if these restraints have any competitive benefit, there anticompetitive effects vastly outweigh any such benefit.

124.    Even if, counterfactually, Rouse's has some legitimate rationale, which is at all times denied, those objectives could be realized through less restrictive means.  Rouse's restrictions and

boycotts offer no procompetitive justification to offset the anticompetitive harm and undue restraints of trade caused by the conduct detailed in this Complaint.

125.   Izzo's has functioned successfully without Rouse's restrictions and boycotts in dozens of markets in the Louisiana.  Defendants' intent in enacting the restrictions and boycotts is to enable Rouse's to dictate which retail food businesses can operate regardless that fair competition could be sustained in a competitive market which includes Izzo's, LIT Pizza and its owners or other concepts.

126.   So far, the Rouse's defendants have admitted that getting caught with Izzo's recipe book was embarrassing causing them anger and ill will toward Izzo's, their affiliate and their owners. Rouse's has already admitted that they imposed these restrictions out of their ill-will and ill-motives toward Izzo's out their hatred for Izzo's, their owners and affiliates.

127.   Likewise, Rouse's has admitted that it inserted the exclusion for 2 false reasons: 1) that Izzo's was litigious; and 2) Izzo's files baseless lawsuits.  Rouse's wanted Izzo's in their stores, so it is clear that Rouse's was impressed with Izzo's product.  Also, Izzo's, as a matter of fact, is not litigious as it had only filed one lawsuit to recover its Recipe Book and Izzo's won that claim. Clearly, Rouse's embarrassment has grown into a great hatred.  Plaintiffs and Plaintiffs owners are suffering additional damages in the form of destruction of business in the cities and parishes market, loss of goodwill, and loss of business reputation.  The loss of goodwill includes: (a) loss of goodwill with developments' consumers when they travel to other areas where Izzo's is not available; (b) loss of goodwill with existing consumers who travel to these cities and parishes; and (c) the total destruction of Izzo's market within these cities and parishes. Rouse's has likewise lied and told developers that Izzo's sells substandard product. This is absurd considering Rouse's uses Izzo's recipes and Rouse's doesn't have Izzo's over seeing operations.  However, Rouse's has copied Izzo's Recipe Book and uses it.

128.   None of the defendants have immunity from liability for money damages.  In undertaking concerted anticompetitive conduct, because Rouse's controls which retail food stores are active market participants.

**COUNT IV - Conspiracy To Violate La. Civ. Code Arts. 2324, et seq. as to all Defendants**

129.   Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1-128 through as if fully set forth herein.

23

130.    Pursuant to La. Civ. Code Articles 2315 and 2324, et seq., all of the allegations stated above from paragraph 1 through 129 all alleged statements, claims and allegations set forth a civil conspiracy set forth among the defendants to exclude and group boycott the plaintiffs from highly desirable developments.  These conspiracies were in writing, very specific to exclude Izzo's and its affiliates.

131.    In addition to these written agreements to illegally boycott the plaintiff, each of the defendants' names herein are made in act of the furtherance of the conspiracy by rejecting Izzo's LIT pizza and any other development created by Fernandez and Kovacs. To be clear, these leases between Rouse's and Narf Management, LLC with EVT, EQUITY ONE, and Bel Commercial, Limited Liability Company are written conspiracies in violation of the law.

132.    As a result of the conspiracy outlined in detail above in numerous paragraphs to exclude and boycott plaintiffs and the defendants wrongful act in furtherance of conspiracy by rejecting the plaintiffs, the plaintiffs have suffered damages such as loss of new stores, loss of reputation, loss of goodwill, loss of revenue and loss of profits since the dates of the wrongful acts of rejection the plaintiffs as set forth herein.

**COUNT V. Rouse's Illegal Use of Izzo's Trade Secrets**

133.    Plaintiffs reallege and re-aver all allegations, statements of facts and causes of action set forth in Paragraphs 1 through 132.  As stated, Izzo's burrito recipes are closely-guarded trade secrets. Rouse Jr. has caused Rouses to continue to possess and use these trade secrets since 2011. This illegal activity is ongoing and will not halt without judicial intervention.  See Affidavit of Patrick Dartez and Matthew Mahl.

134.    This violates La. Rev. Stat. 51:121, which state, in pertinent part:

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly-...

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization....or

(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

This conduct is a form of "racketeering activity," and also a violation of Title 51 of the La. Rev. Stat.

**COUNT VI - Product Defamation and Disparagement against the Rouse's Defendants**

135.   Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1 through 134 as if fully set forth herein.

136.   The various aforementioned acts and practices by Rouse's constituted and continue to constitute defamation of Izzo's and its partners' product and name.

137.   At all times relevant hereto, Rouse's made untruthful statements to third parties directly attacking the good name and product of Izzo's.   Specifically, the Rouse Group told its co-conspirators that Izzo's produced substandard product and was extremely litigious.

138.   Rouse's false statements about the quality of Izzo's products and its alleged "highly litigious behavior", was told to several third parties but for certain to each of the co-conspirators herein, EQUITY ONE, EVT, and Bel Commercial, Limited Liability Company.

139.   At all times relevant hereto, the Rouse Group knew that Izzo's produced a great product. As evidence, Rouse's requested that an Izzo's locate within its stores and Rouse's subsequently misappropriated and wrongfully converted Izzo's recipes, which they still use today.

140.   Likewise, the Rouse Group knew that Izzo's and its owners were not litigious by the very fact that Izzo's caught a Rouse's employee with their Recipe Book behind the burrito stand located in Rouse's Lafayette store and yet Izzo's and its owners decided not to assert claims against Rouse's based on allegations that Rouse's counsel claimed Rouse's did not use any of Izzo's recipes.  Which plaintiffs now know is to be untrue.  At all times hereto, Rouse's acted with actual malice, spite and ill-will towards Plaintiffs.

**COUNT VII - Tortious Interference and Business Relations as to all Defendants**

141.   Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1 through 140 as if fully set forth herein.

142.   The Rouse defendants caused Patrick Dartez to violate his contract and fiduciary duty to Izzo's by revealing trade secrets and trade practices of Izzo's, knowing that Dartez had a contract with Izzo's and wanting him to violate it in bad faith.

143.   The various aforementioned acts and practices by the Rouse Group and co- conspirators have tortuously interfered and continue to tortuously interfere with lawful business relations between Izzo's and its partners and other developers.

(i)   The Rouse defendants have lied to the co-conspirators claiming that Izzo's sells substandard product and that Izzo's is overly litigious;

(ii)   The Rouse defendants published this information, knowing it to be false, to the general public and developers to convince developers not to do business with Izzo's;

(iii)   At all times material hereto, the Rouse defendants knew the information was false and published it to others with ill motive or ill intent; and

(iv)   Rouse defendants were successful in their lies persuading the developers not to do business with Izzo's resulting in damages to the plaintiffs.

144.   At all times relevant hereto, Defendants acted with actual malice, spite and ill-will as discussed in detail above.  In fact, Donny Jr. told Russel Mosely that "Izzo's will never make a fu...ng dollar off of me!"

**COUNT VIII - Trademark Infringement. La R.S. 51:211, et seq. as to Rouse's Defendants**

145.   Plaintiffs renew and reiterate all of the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146.   The Rouse defendants have converted Izzo's recipes and used its trade name which is deceptively similar.  Izzo's uses "Roll your own", while Rouses using Izzo's Recipe Book, uses "Build your own." This constitutes a trademark infringement.  The various aforementioned acts and practices by the Rouse Group constituted and continue to constitute trade infringement under La. R.S. 51:211 et seq., because Rouse's use of Izzo's proprietary information is intended to and is likely to cause confusion or mistake and is intended to and has deceived consumers as to the source of origin of such goods or services.

147.   Pursuant to La. R.S. 51:211, et seq., Defendants are liable to Plaintiffs for any and all damages resulting from their acts which have caused damages to Plaintiffs and for any amounts by which Defendants have been unjustly enriched in connection therewith.

148.   Defendants engaged in concerted activity as part of a conspiracy to prevent full and fair competition in the relevant market.  Upon information and belief, each of the anticompetitive actions described in this complaint was taken pursuant to an illegal agreement by and among the Defendants. That unlawful agreements are evidenced by, among other things, the leases, the deed, the economic interests of Defendants Rouse's, EQUITY ONE, EVT and Bel Commercial, Limited

Liability Company; the close relationships among Defendants; Defendants' concerns about the competitive threat that Izzo's application posed to the Defendants; the history and anticompetitive practices of Rouse's; and the timing of various anticompetitive actions taken by Rouse's, EQUITY ONE, EVT and Bel Commercial, Limited Liability Company.

149.    Pursuant to their conspiracies and unlawful agreements, Defendants have engaged in per se anticompetitive behavior, or, alternatively, anticompetitive behavior without procompetitive justification, that has unreasonably retrained trade in violation of the Louisiana Antitrust Statute. This anticompetitive behavior includes but is not limited to:

(i)    buying or leasing properties from developers upon the condition that developers would not sell or lease, nor allow to be sold or allow to be leased to any property by Izzo's, K & F Restaurants, its individual owners and any new food concept;

(ii)   entering into leases with restrictions that lessors or developers will not sell or lease any space for any retail food concepts created by the owners of Izzo's, LIT Pizza or any other food concept of Plaintiffs;

(iii)  expanding its retail food sales into new areas and developments containing the exclusion of any retail food concept by Izzo's, LIT Pizza or their owners;

(iv)   conspiring to restrict plaintiffs' entry into highly desirable development markets inside and outside Baton Rouge, Livingston, Lafayette, Lake Charles and Calcashiue; and

(v)    proposing, after secret drafting that excluded relevant stakeholders and even one Rouse's member, additional or developers and lessors rules specifically targeting Izzo's, LIT Pizza, and all retail food concepts created by the owners of same.

150.    This anticompetitive behavior substantially affects intrastate commerce.  As just one example, throughout Southeast Louisiana's border of the Rouse's reach is coterminous with the Southeast Louisiana border, and on a daily basis the anticompetitive behavior prevents would-be consumers from buying Izzo's and LIT Pizza and request stores across this State line for business or retail purposes.

151.    Defendants' concerted action has prevented Izzo's, LIT Pizza and all food concepts of its owners from participating in the relevant market and has prevented consumers from providing or using plaintiffs' services involving Izzo's, LIT Pizza and all food concept of its owners in the relevant market.

152.    Defendants' conduct has damaged competition in the relevant market, dictating prices and reducing competition for retail food services, all to the detriment of consumers and Plaintiffs in the relevant market.  For example, Izzo's, LIT Pizza and all food concepts of its owners have lost

revenue that they otherwise would have generated by participating in the relevant market, and consumers in these cities and parishes have paid higher prices for retail food services than they would have but for Rouse's anticompetitive conduct.

153.    None of Defendants' anticompetitive practices were reasonably necessary for the proper functioning of the retail food service market in these cities and parishes. Any benefits that Defendants claim are achieved by these undue restraints of trade can be accomplished by means that are less harmful to competition. Even if these restraints have any competitive benefit, there anticompetitive effects vastly outweigh any such benefit.

154.    Even if, counterfactually, Rouse's has some legitimate rationale, which is at all times denied, those objectives could be realized through less restrictive means. Rouse's restrictions and boycotts offer no procompetitive justification to offset the anticompetitive harm and undue restraints of trade caused by the conduct detailed in this Complaint. Indeed, Izzo's has functioned successfully without Rouse's restrictions and boycotts in dozens of markets in the Louisiana. Defendants' intent in enacting the restrictions and boycotts is to enable Rouse's to dictate which retail food businesses can operate regardless that fair competition could be sustained in a competitive market which includes Izzo's, LIT Pizza and its owners or other concepts.

155.    Plaintiffs and Plaintiffs owners are suffering additional damages in the form of destruction of business in the cities and parishes market, loss of goodwill, and loss of business reputation. The loss of goodwill includes: (a) loss of goodwill with developments' consumers when they travel to other areas where Izzo's is not available; (b) loss of goodwill with existing consumers who travel to these cities and parishes; and (c) the total destruction of Izzo's market within these cities and parishes.

156.    None of the defendants have immunity from liability for money damages. In undertaking concerted anticompetitive conduct, because Rouse's controls which retail food stores are active market participants.

157.    Defendants knowingly failed to honor the obligation not to disclose IZZO'S's Confidential Information and Trade Secrets pursuant to Paragraphs 2 and 3 of Dartez's Agreement.

158.    Defendant knowingly failed to honor Dartez's obligation to return Izzo's Recipe Book when his employment ended in violation of Paragraph 8 of his Agreement.

159.    Defendant failed to honor Dartez's obligation not to use IZZO'S Confidential Information and Trade Secrets other than in the performance of his designated duties for IZZO'S in violation of Paragraphs 2 and 3 of the Agreement. Rouse's bribed him to violate these provisions and knowingly did so.  Accordingly, Rouse's should be enjoined from further violation of Izzo's Trade Secrets and Practices.

160.    Defendants are liable to IZZO'S for all damages that result from Defendant's defaults of the Agreement, including but not limited to injunctive relief.

### CAUSE FOR ISSUANCE OF PRELIMINARY INJUNCTION

IZZO'S incorporates by reference each and every foregoing paragraph as if fully set forth herein.

161.    On information and belief, defendants have possession of a copy of the Izzo's Recipe Book that it kept from Patrick Dartez.

162.    Because of the movable nature of the Izzo's Recipe Book and the ease with which such property could be destroyed, defendants have the power to "conceal" or "dispose of' Izzo's Recipe Book or to remove it from its stores during the pendency of this action. La. Code Civ. Proc. art. 3571.

163.    Plaintiffs allege that they will suffer irreparable harm if the defendants are not enjoined from continuing exclusions to their growth; Further, Plaintiffs allege that the actions of the defendants violate the Louisiana Unfair Trade Practices law and Louisiana Antitrust Law. Accordingly, plaintiffs are entitled to an injunction without the need to show irreparable harm.

### PRAYER

**WHEREFORE**, Plaintiffs pray that Defendants be cited and served with a copy of this Petition and that after due proceedings, there be judgment in their favor in a sum reasonable to compensate Plaintiffs, together with interest from date of judicial demand until paid, and all costs of these proceedings. Plaintiffs further pray for a hearing on their Preliminary Injunction and that, upon furnishing applicable security as required by law, this Court issue an Order to the defendants to show cause why the Plaintiffs are not entitled to the issuance of a Preliminary Injunction, and that Defendant be cast for all costs of the injunction and attorneys' fees. Plaintiffs further pray for all other just and equitable relief that this Court deems appropriate.

29

164.    Plaintiffs pray for jury on all issues.

**WHEREFORE**, PLAINTIFFS pray that this Petition for Damages be filed herein and that after due proceedings be had, and after trial by jury, there be entry of a Judgment in favor of Plaintiffs and against all Defendants, jointly and in solido, for any and all damages and losses caused by the acts, practices, and conduct of all Defendants in violation of  La. Civ. Code Art. 2315, et seq., La. Civ. Code Art. 2324, et seq.; for penalties, punitive damages, treble damages, costs and interest and for all attorney's fees and costs incurred; and for any and all other just and equitable relief that this Honorable Court deems appropriate.  Plaintiffs further pray for injunctive relief prohibiting the defendants from boycotting and other illegal activities as alleged herein.

Respectfully Submitted:

The Evans Law Corporation

THE EVANS LAW CORPORATION
/s/ Robert B. Evans, III
Robert B. Evans, III #23473
Joshua D. Allison, #36142
3445 N. Causeway Blvd., Suite 707
Metairie, Louisiana 70002
Telephone: (504) 304-3230
Counsel for Plaintiffs

**PLEASE SERVE:**

**ROUSE'S ENTERPRISES, LLC**
Through agent for service of process:
**ALLISON ROYSTER**
1301 St. Mary Street
Thibodaux, LA 70301

**DONALD J. ROUSE, SR.**
Through agent for service of process:
**ALLISON ROYSTER**
1301 St. Mary Street
Thibodaux, LA 70301

**DONALD J. ROUSE, JR.**
Through agent for service of process:
**ALLISON ROYSTER**
1301 St. Mary Street
Thibodaux, LA 70301

30    **RECEIVED**

MAY 14 2018

DIVISION O
JUDGE FIELDS

**ALLISON ROYSTER (AGENT)**
1301 St. Mary Street
Thibodaux, LA 70301

**EQUITY ONE (LOUISIANA PORTFOLIO) LLC**
Through agent for service of process:
**UNITED AGENT GROUP, INC.**
1070-B West Causeway Approach
Mandeville, LA 70471

**EVT BATON ROUGE LOUISIANA, LLC**
Through agent for service of process:
**CT CORPORATION SYSTEM**
3867 Plaza Tower Drive
Baton Rouge, LA 70816

**BEL COMMERCIAL, LIMITED LIABILITY COMPANY**
Through agent for service of process:
**JOHN C. THIELEN**
500 Kirby St.
Lake Charles, LA 70601

**NARF MANAGEMENT, LLC**
Through agent for service of process:
**THOMAS B. ROUSE**
308 Cedar Tree Drive
Thibodaux, LA 70301

**THOMAS B. ROUSE (AGENT)**
308 Cedar Tree Drive
Thibodaux, LA 70301

5/8/2018        Cornering the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...

East Baton Rouge Parish Clerk of Court                                                                                  Page 1 of 41





(https://www.businessreport.com)



## Cornering the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer

ANNIE OURSO LANDRY

JANUARY 18, 2017 I BUSINESS



...'t expect the community to jump behind us right away because they don't know us," says Rouses CEO Donny .."But once we show what we can do, I think we will gain the trust and loyalty of the Baton Rouge community we won't stop until we do." Photography by Allie Appel



East Baton Rouge Parish Clerk of Court the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...      Page 2 of 41

On Aug. 16, local news outlets shared a video of Donny Rouse in hip boots, wading through a mass of floating groceries in the flooded Rouses Supermarket in Denham Springs. Wearing a protective mask and headlamp, Rouse surveyed the widespread damage inside the darkened store and pointed to a waterline on a nearby display case that measured about four-and-a-half feet.

The video was shot just two days after historic flooding devastated Livingston Parish and destroyed the Rouses location at Juban Crossing, which wasn't even two years old. Disaster had struck just as Rouse was in his first year as CEO—the third generation to lead his family's Thibodaux-based grocery chain. The flood could have presented a major setback. But Rouse acted quickly, calling contractors to begin restoration as soon as floodwaters receded.



The Denham Springs store marked Rouses' first foray into what looked to be a slow entrance into the greater Baton Rouge market, which has increasingly grown crowded for grocery stores in recent years. In two weeks, another location would open at Long Farm Village on Airline Highway, and plans were underway for another Baton Rouge store to be built this year.

But Rouses' expansion plans were thrust into overdrive in October, when it was announced the Rouse family was buying out all nine LeBlanc's Food Stores locations in the Capital Region—suddenly making Rouses the largest grocery chain in the area.

Rapid growth isn't exactly anything new for the 57-year-old business, at

(https://d1dxs113ar9ebd.cloudfront.net/business-report/2017/08/Rouses- least since it swept the 2008 election. Ever since Rouses expanded beyond the
Re-Opening-in-Denham-                                   Houma-Thibodaux area and into New Orleans in 2007, it has continued to
Springs_Allie-Appel_7.jpg)                              push into major markets along the Gulf Coast—from Lafayette to Gulf
                                                        Shores, Alabama—at a breakneck pace. In the 10 years since, the company
Photography by Allie Appel                              has grown from 16 stores in Louisiana to 54 across three states, with a
workforce of more than 6,000 employees. Rouse says revenue has more than doubled during that time.

"Either you're going to grow or competition is going to come in and you're gonna lose your business," Rouse says. "You have to make a decision of what the future of the company is going to be, and we decided we wanted to grow."

Small profit margins—typically 1% to 2% for most stores—make the grocery industry a tough business. But large players in the industry like Rouses can maintain higher profits as they grow and gain buying experience, says Rouse, adding his family's business benefits from its partnership with Associated Wholesale Grocers, the largest distributor in the U.S.

"As you grow, you learn. Your buying gets better and you're able to increase profits," he says. "AWG's buying power helps us get the cost of goods we need to compete."



(https://d1dxs113ar9ebd.cloudfront.net/businessreport/2017/01/Rouses-Re-Opening-in-Denham-Springs_Alile-Appel_5.jpg)

Photography by Alile Appel

Rouse, the 34-year-old grandson of founder Anthony Rouse Sr., spearheaded much of the recent growth into metro Baton Rouge, including the October acquisition of LeBlanc's Food Stores.

News of the LeBlanc's buyout made big headlines in the Capital Region and came as a surprise to many. For Rouses, though, it was a perfect fit. Although new to the market, Rouse believes his stores can win over Baton Rougeans the same way they've won over shoppers in other new markets: By providing a modern, high-quality shopping experience with a relentless focus on Louisiana products and suppliers.

"I don't expect the community to jump behind us right away because they don't know us," Rouse says. "But once we show what we can do, I think we will gain the trust and loyalty of the Baton Rouge community—and we won't stop until we do."

And Rouse's plans to expand his family's business don't start and end with its big buy in Baton Rouge. In fact, he's already got his eye on another new market: Lake Charles.

"There's still a lot of opportunities in the Baton Rouge market for new stores," he adds. "There's room in Lake Charles; still room in Lafayette. We have a lot of holes to fill along the Gulf Coast. I enjoy the job and I'm only 34-years-old—so there's no end in sight."

## 'A CELEBRATION OF FOOD'

On Dec. 14—exactly four months after the flood—Rouses holds a grand reopening ceremony for its Denham Springs store. The parking lot is packed. Shoppers stream in and out of large entrances the size of garage doors. Houma-based Big Mike's BBQ Smokehouse is out front serving up smoked sausage, barbecue sauces, spices and rubs.

As shoppers walk in, they're met with an array of colors, from the yellow, pink and purple hues that burst forth from a floral section of sunflowers, lilies and carnations to the vibrant oranges, red apples and fresh greens that fill an abundant produce section. The decor is festive, and the environment is lively. A large sign reads "Fresh Foods" above a display of prepared meals and side dishes.



"A celebration of food right as you walk in." That's how Steve Black, the company's new president and COO, describes the Rouses experience. Black is a 40-year veteran of the industry and former president of Colorado-based Lucky's Market. He joined Rouses in November because he was impressed by the family business and its vision for the future.

(https://d1dxs113ar9ebd.cloudfront.net/businessreport/2017/01/Rouses-7.jpg)

Rouses Marketing and Advertising Director Tim Acosta says the company's principles are rooted in the words of founder Anthony Rouse Sr., who "always said best quality and best price. The customer is always right. The answer is 'yes.'" Photography by Allie Appel

...and there's a supermarket in the country that's got it all together, it's Rouses," Black says as he surveys the crowd at the Denham Springs reopening.

The produce section is a focal point of the 50,000-square-foot store. To the right is a traditional setting of basic grocery aisles. To the left is an upscale epicurean market with an extensive deli, prepared foods, fresh meat and seafood departments, as well as gourmet cheeses, signature desserts, salad and olive bars, a coffee-grinding station, sushi bar and even a Mongolian grill.

Rouses' culinary expertise is on display at every turn. It's a new store concept, where customers can watch as cooks cut meats and vegetables, and prepare their sushi, paninis and smoked brisket plate lunches. Some customers come to shop. Some come to eat. Many do both. And that's what Rouses wants: Customers spending time in their stores and enjoying the experience, as Rouse explains while sitting in the dining area as a lunchtime crowd gathers.

"At Rouses, we want to have the full shopping experience for our customers," Rouse says. "We offer what Whole Foods offers. We offer what Wal-Mart offers. We do it at great prices, and we also have the local products that independent grocers have."

(https://d1dxs113ar9ebd.cloudfront.net/businessreport/2017/01/Rouses-Re-Opening-in-Denham-Springs_Allie-Appel_31.jpg)

After launching Rouses' sushi program 12 years ago, New Orleans native Chip Martina became the grocery store chain's seafood specialist. Today, he travels to all Rouses locations throughout the Gulf Coast to oversee the seafood departments and train employees. Photography by Allie Appel

Chip Martina, Rouses' seafood specialist, describes the concept as "Whole Foods quality without the high prices." Martina, 60, is a New Orleans native and former California sushi chef who started Rouses' sushi program 12 years ago. Now he travels to Rouses locations and trains employees in the seafood department—Rouses' proudest area of expertise.

"Come see our shrimp," Martina says, motioning to a display of enormous raw shrimp recently harvested from the Gulf. With Thibodaux as its base and Houma as its birthplace, Rouses has longstanding ties with local fishermen, and most of the seafood it sells—speckled trout, redfish, crabs and oysters, among other catches—is from local Gulf Coast suppliers.

"We do seafood better than anyone," Rouse says. "We know seafood. We grew up around seafood. We sell more Louisiana shrimp and crawfish than any retailer in the state."

5/9/2018          Cornering the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...

But Rouses' emphasis on local extends far beyond seafood. From produce and salad dressings to craft beer, cajun sausage and barbecue sauce, Rouses stocks and celebrates local providers. Jim Dudlicek, editor-in-chief of trade publication *Progressive Grocer*, says this focus has been a major part of Rouses' success.

"Rouses has become a tireless supporter of local products, using its success to boost its many home-state suppliers," Dudlicek says. "The folks who run Rouses know food and the people who make it—they know the farmers, the growers, the fishermen."

## PIONEER OF THE MODERN SUPERMARKET

Anthony Rouse Sr. began his career shipping local produce around the country with his father, Joseph P. Rouse, who owned City Produce Co. in Thibodaux. In 1960, Rouse left the business to start a grocery store with his cousin in Houma. The store measured a modest 7,000 square feet, had just four employees—including the senior Rouse—and sold locally grown produce, Louisiana seafood and fresh meat.



(https://d1dxs113ar9ebd.cloudfront.net/business/2017/01/Page-26_RousesTimeline.jpg)

A timeline of Rouses growth (click to enlarge)

By 1975, the store opened a second location in Thibodaux, where the company is now headquartered. Rouses continued to expand throughout the Houma-Thibodaux area in the 1980s, and Anthony Rouse's sons, Tommy and Donald Rouse, eventually took over day-to-day operations. In 1995, the company opened a location in Metairie, and by the early 2000s, it had stores in Covington, Mandeville and Slidell.

The first major expansion came in 2007, when Rouses acquired 17 Sav-A-Center and A&P stores in New Orleans, plus two in Mississippi, just two years after Hurricane Katrina. Rouses had been trying to break into New Orleans for years, but real estate was expensive and hard to come by for supermarkets.

"Sav-A-Center supermarkets were going bankrupt, so they were for sale and we saw that as the only opportunity to get into New Orleans," Donny Rouse says. "We had 15 stores at the time, and we purchased 17. We doubled our size in one month. We had the right team in place to be successful, and that was our only choice."

When Anthony Rouse died in 2009, he was lauded as a pioneer of the modern supermarket. Rouses was operating 35 stores with 4,700 employees, and still growing. Its next market was Acadiana, where Rouses opened a store in Youngsville in 2009, followed by two more in Lafayette in 2011 and 2014. Meanwhile, the supermarket broke into Alabama in 2013 when it took over six former Belle Foods locations.

Much has changed within Rouses Supermarkets over the last 57 years. When it first started out, at least 75% of sales in the stores were basic grocery items, Rouse says. Today, more than 50% of sales are in the fresh market side—the deli, produce, bakery and prepared foods sections.

"For us, our company changed strategies in the late '90s," he says. "We built our first epicurean-style store in Thibodaux in 1999."

East Baton Rouge Parish Clerk of Court ... the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...   Page 6 of 41



The stores continued to evolve, with new formats and culinary innovations. But even though the industry was changing, Rouses stayed true to its Louisiana roots and commitment to the local community—a legacy that lives on.

"Rouses leverages its position as a homegrown Louisiana company," says Dudlicek of *Progressive Grocer*, "using good quality and service to endear itself to customers, many of whom are devoted, loyal shoppers who rally around their neighborhood store as 'My Rouses.'"

(https://d1dxs1i3ar9ebd.cloudfront.net/businessreport/2017/01/Page 30_InfoBox.jpg)

A look at Rouses locations throughout the Gulf Coast (click to enlarge)

Tim Acosta has worked for Rouses since the early 1980s and is the founder's son-in-law. Today, as the marketing and advertising director, Acosta says he still remembers the principles instilled early on at Rouses: "Anthony Rouse Sr. always said best quality and best price. The customer is always right. The answer is 'yes.'"

## TAKING THE CAPITAL REGION

By 2014, Rouses was in every major market across southeast Louisiana except one: The Capital Region. Thanks to the LeBlanc's buyout, it now boasts more stores in the area than any other grocery store chain.

Similar to Rouses, LeBlanc's was a family-owned business with a history dating back to 1961. It operated nine stores: two in Gonzales and one each in Prairieville, Baton Rouge, Zachary, Donaldsonville, Plaquemine, Plattenville and Hammond.



Randy LeBlanc, who owned the business with his brother Marcy, told *Daily Report* in October the Rouses deal came at the right time and was just too good to pass up. LeBlanc, a third-generation owner, said he had been planning an exit strategy for a few years. He even talked to his brother Marcy about buying him out, but it didn't work out.

For now, neither the Rouses nor the LeBlancs are interested in discussing the deal in any great detail. Both Randy and Marcy LeBlanc declined any further comment on the buyout for this story. Rouses also declined interview requests with fourth-generation LeBlanc family members who joined the Rouses team after the sale.

(https://d1dxs1i3ar9ebd.cloudfront.net/businessreport/2017/01/LeBlancs.jpg)

The LeBlanc's at the Drusilla Village Shopping Center is one of nine being rebranded as Rouses. Staff photo

From Donny Rouse's perspective, the LeBlanc's acquisition just made sense. The supermarket had several quality locations, the LeBlancs ran a good operation and it was more cost effective to acquire stores in Baton Rouge than build them from the ground up. Rouse reached out to the LeBlancs first, and they

negotiated for the next eight to nine months.

"We've known Randy and Marcy a long time," he says. "We called them and kind of gauged their interest. They had some interest, and they continued talking. It just so happened they were ready to retire."

Local grocers who know the LeBlanc family say they did not see the buyout coming. Although many don't know the Rouses quite as well as the LeBlancs, they've kept a positive outlook in light of new competition entering the market.

"I don't know a whole lot about about Rouses," says Blaise Calandro, co-owner of Calandro's Supermarket. "I know the LeBlanc family well. I was surprised about the sale."

Jim Crifasi, president of Hi Nabor Supermarkets, and Ernie Matherne Sr., owner of Matherne's Supermarket, both say they don't expect Rouses' entrance into Baton Rouge to have much of an effect on their businesses. Rouses may offer more products and an upscale concept, but Hi Nabor and Matherne's still count on their loyal customers.

> **"Rouses leverages its position as a homegrown Louisiana company using good quality and service to endear itself to customers, many of whom are devoted, loyal shoppers who rally around their neighborhood store as 'My Rouses.'" — Jim Dudlicek, editor-in-chief, *Progressive Grocer***

"It won't affect us that much. We have a strong customer base," Crifasi says. "I think Rouses is looking for a more affluent clientele."

But Calandro maintains that anytime a new grocery store comes to town, it's going to have an impact on other local grocers, especially in a crowded market like Baton Rouge. Once home to a smattering of local grocers like Calandro's, Hi Nabor and Associated Grocers affiliates, Baton Rouge has seen national competitors like Whole Foods, Fresh Market and Trader Joe's enter the market over the past decade. Meanwhile, other locally owned supermarkets with a focus on local products, such as Alexander's Highland Market, have also opened. Shoppers will cross grocery competitor lines, Calandro says, and especially to check out a new store.

For local entrepreneurs who specialize in Louisiana food products, however, Rouses' entrance into Baton Rouge provides an ideal opportunity to get their products on the shelves of a major market. Several well-known names from Baton Rouge are already there, like Hanley's Foods, Jay D's and The Cajun Spoon.

Richard Hanley, owner of Hanley's Foods, says Rouses actually reached out to him in 2014. The Prairieville-based company produces a line of all-natural salad dressings available in 500 stores throughout five states. After Rouses approached him, Hanley traveled down to Thibodaux with his product, and Rouses bought it. The supermarkets started carrying the dressings in 2015.

"That alone has greatly impacted our business," Hanley says. "One of our best relationships with a store in general is Rouses. They're easy to work with, good people."



While the addition of Rouses may be good for those like Hanley, the loss of LeBlanc's could be a blow to Associated Grocers, the Baton Rouge-based wholesale supplier that's owned by its retail members. LeBlanc's was one of its larger members, but Rouses—a former member—now receives its grocery supply from Associated Wholesale Grocers of Kansas City, Kansas, after a falling out nearly a decade ago.

Rouses and Associated Grocers had a more than 40-year partnership when Rouses filed a lawsuit in 2008, claiming to have been improperly ousted from membership and not adequately compensated for ownership interest in the wholesale company. Rouses sought more than $900,000 in damages as well as restoration of its membership. The two reached an undisclosed settlement in October 2014, but Rouses remained with AWG going forward.

(https://d1dxs113ar9ebd.cloudfront.net/2017/03/page-"We think we're a better partner with Associated Wholesale Grocers," 22_SupermarketSweep.jpg) Rouse says.

A look at grocers that have entered the Baton Rouge market over the past decade (click to enlarge)

Dudlicek, of *Progressive Grocer*, says the acquisition could hurt Associated Grocers if LeBlanc's was a significant portion of its business and it's not able to fill the void. Associated Grocers could stick it out, he says, or it may eventually find it beneficial to merge with another company, as AWG did last year, when it joined forces with Affiliated Foods Midwest.

"It's difficult to say goodbye," says Associated Grocers President and CEO Emile Breaux of the LeBlanc's buyout, declining to comment further.

When the acquisition was announced in October, Breaux expressed regret but remained confident about the future of the company in a prepared statement, saying that its balance sheet is "rock solid." Local Associated Grocers members also say they aren't worried about losing LeBlanc's because the distribution company still has nearly 200 members.

"I think AG will be fine," Crifasi says.

## THE NEXT GENERATION

With the expansion into Baton Rouge and LeBlanc's acquisition, Rouse—who became a managing partner in 2010—had quite a productive first year as CEO of the family business. His father, Donald Rouse, still serves as a board member. Another third generation Rouse, Tommy's daughter Allison Rouse Royster, is also an integral part of the team. Several other family members work within the business as well.



(https://d1dxs113ar9ebd.cloudfront.net/businessreport/2017/01/Rouses-
Re-Opening-in-Denham-Springs_Allie-
Appel_26.jpg)

Photography by Allie Appel

> "Either you're going to grow or competition is going to come in and you're gonna lose your business. You have to make a decision of what the future of the company is going to be, and we decided we wanted to grow." — Donny Rouse

If there's a face of Rouses Supermarket, though, it's Donny's. His name, photo and quotes are seen on signs throughout the stores, and he speaks for the company in the media. But in person, Donny Rouse is reserved and low-key. He doesn't grandstand. He personally visits stores on a regular basis to meet with employees and shake hands with customers. He says that's just his business style.

"I'm very relaxed," he says. "I let my team do their job, and I don't micromanage them. I have high expectations, and as long as we're achieving that, everybody's happy."

Rouse lives in Thibodaux, his family's beloved hometown, with his wife and three children. His typical work day varies. Some days are spent in the office discussing real estate or pricing and merchandising. Other days he's out in the stores.

"And on the really good days, I'm hunting," Rouse says, letting his down-the-bayou roots peek through his business casual exterior.

The laid-back style almost seems a bit out of place for a company that has seen such enormous growth over the past few years. Last year alone, Rouses added more than 10 new stores. It also implemented a new concept for larger markets in recent years, emphasizing the culinary experience with a modern, open layout. And in 2015, Rouses hired a registered dietitian to head the company's new "Eat Right with Rouses" program.

With so many changes and rapid growth in so little time, how does a grocery chain with small-town Louisiana roots keep up? Rouse credits his team, and says it starts with having the right people in the right place. Plus, the family has built up high expectations for Rouses over the years, which is what drives Rouse to succeed as its new CEO.

"It's the expectations that our customers have for Rouses," he says, "and the expectations that my family has for me."

---

## RELATED STORY

### Grocery Wars: Rising competition is forcing Baton Rouge supermarkets to increase offerings and carve out niche customer bases

5/8/2018          Cornering the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...

(http://www.businessreport.com/business/grocery-wars-rising-competition-forcing-baton-rouge-supermarkets-increase-offerings-carve-niche-customer-bases)

4 Comments (https://www.businessreport.com/business/cornering-market-just-34-donny-rouse-made-aggressive-play-become-baton-rouges-biggest-grocer#disqus_thread)

# POLLS

5/9/2018      Cornering the Market: At just 34, Donny Rouse has made an aggressive play to become Baton Rouge's biggest grocer - Baton Rouge Bus...

# MOST READ

Is your company cybersecure? Local expert offers advice on fighting hackers and malware
(https://www.businessreport.com/article/company-cybersecure-local-expert-offers-advice-fighting-
hackers-malware)

Business consultant: Everyone has responsibility to promote workforce diversity
(https://www.businessreport.com/article/business-consultant-everyone-responsibility-promote-
workforce-diversity)

Capitol Views: Occupational licensing overhaul still afloat
(https://www.businessreport.com/article/capitol-views-senators-keep-simplified-licensing-overhaul-
afloat)

Kolache Kitchen expanding to New Orleans in fall (https://www.businessreport.com/article/kolache-kitchen-expanding-new-orleans-fall)

## Stay up to date with the
# DAILY

Email address

**SIGN ME UP**

Hello My name is Matthew Mehl this
letter is too serve as a documentation of what
I witnessed while working at Rouses on Bertrand.
I originally started working in the meat department
but then got pulled into the deli where I worked
for Patrick Oartez, While working for him after a short
period of time a position opened up at the Burtle
Station and I took it. A little while after it was
brought to my knowledge that there was a Izzos
recipese book on the shelf but the Izzos name
had been cut out. From my knowledge there was no
recipese being used out of the book.
    Once leaving Rouses I applied at Izzos
where during My interview I stated working a Burtla
Station at Rouses, and then that's how the conversation about
the topic came up. I was later showed a recipe book
from Izzos and it matched the one I had seen
at Rouses on Bertrand in the Deli department.

                                    Sincerely Matthew Mehl

2/1/2012        [signature]

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

K&F RESTAURANT HOLDINGS, LTD      * CIVIL ACTION NO. 16-293
IZZO'S ILLEGAL BURRITO;      *
K&F RESTAURANT OPERATIONS, LLC;      * JUDGE J.W. deGRAVELLES
G&O PIZZA HOLDINGS, LTD d/b/a LIT PIZZA;      *
G&O RESTAURANT OPERATIONS, LLC;      * MAG. ERIN WILDER-
OSVALDO FERNANDEZ; and      * DOOMES
A. GARY KOVACS      *
     *
Versus      *
     * JURY TRIAL
DONALD J. ROUSE, JR.; DONALD J. ROUSE, SR.;      *
THOMAS B. ROUSE; ALLISON ROUSE ROYSTER;      *
and ROUSE'S ENTERPRISES, L.L.C.      *
******************************************************************

## AFFIDAVIT OF PATRICK DARTEZ

Before me, Notary Public, did come and appear, Patrick Dartez, who did depose and say the

following to wit:

1. I am of the full age of majority and resident of the State of Louisiana, Parish of East
   Baton Rouge.

2. I was formerly the Manager of Izzo's Illegal Burrito in Lafayette.

3. After my employment with Izzo's, I was familiar with the Izzo's recipes and specialty
   cooking practices of Izzo's.

4. I kept a copy of Izzo's Recipe Book and cut out the Izzo's logo from the right hand top
   corner of Izzo's Recipe Book.

5. My managerial experience included special training and practices on cooking and
   prepping food for the Burrito store. and did I not return all the confidential documents as
   per my agreement with Izzo's.

6. Sometime in 2011, I was approached by Jack Treuting, who represented himself to be the
   Director of Perishables for Rouses.

7. Jack Treuting knew that I worked for Izzo's before and asked that I bring any recipes,
   books or other papers that would help Rouse's develop a Burrito Bar.



8.  I started the Burrito Bar at Rouse's based upon the specialized skills, training and recipes that I learned from Izzo's. Accordingly, I set up the Burrito Bar based upon the special training, knowledge, experience and Recipe Book from Izzo's

9.  Although there were times that I did not need the Recipe Book because I remembered the Izzo's recipes, there were times that we pulled pre-made food from the shelves of the Rouse's store to make the Burritos.

10. Jack Treuting offered me a job as a Deli Manager to create a burrito bar and other hot prepared foods with my specialized knowledge, experience, training and Recipe Book.

11. The Izzo's Recipe book was behind the counter for any employee to use. There were occasions that I used the Izzo's Recipe Book to teach employees how to cook certain products.

12. I was unaware that Jack Treuting had previously asked Izzo's to locate their franchises in the Rouse's stores.

13. However, Rouse's did create a Burrito bar based upon the concept and recipes of Izzo's Illegal Burrito, using the name "Build Your Own.".

14. On a separate occasion while I was working for Rouse's, I saw Jack Treuting with a Recipe Book for Whole Foods.

15. At all times, Jack Treuting was acting as the Director of Persihables for Rouse's and he had full knowledge of the use and presence of the Izzo's Recipe Book.

16. I signed a confidentiality agreement with Izzo's not to use their recipes or trade secrets with any other company, and I violated that contract at the request of Rouse's and Jack Treuting.

17. Jack Treuting and various employees were aware that the Izzo's Recipe Book was behind the counter.

18. It appeared to me that it was common practice for Rouse's to obtain recipe other Books from other establishments, and it was no secret.

SWORN TO AND SUBCRIBED

BEFORE ME, LAKiTA V. Oliver

on this 31st of January, 2018

Notary Public

PATRICK DARTEZ

LAKITA V. OLIVER
NOTARY PUBLIC
STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE
COMMISSIONED FOR LIFE
NOTARY ID # 53357

DOCUMENT
NOT PREPARED
BY NOTARY

2

# C

ORIG: 951  BNDL: 12814
5/23/2017  10:17:14 AM

FILED AND RECORDED
EAST BATON ROUGE PARISH, LA
DOUG WELBORN
CLERK OF COURT AND RECORDER

## NOTICE OF LEASE

This Notice of Lease (the "Notice") is executed and entered into this 9th day of May, 2017 (the "Effective Date") by and between EQUITY ONE (LOUISIANA PORTFOLIO) LLC, a Florida limited liability company ("Landlord") and ROUSE'S ENTERPRISES, L.L.C., a Louisiana limited liability company ("Tenant").

## WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Shopping Center Leased dated as of the Effective Date, as may be amended from time to time (the "Lease"), pursuant to which Landlord has conveyed to Tenant a leasehold interest in certain real property located in Baton Rouge, Louisiana as more particularly described in the Lease and in this Notice (the "Premises").

WHEREAS, Landlord and Tenant desire to enter into this Notice to set forth certain terms and conditions contained within the Lease.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby set forth the following terms and conditions with respect to the Lease:

1. _Landlord._ The name and address of Landlord are as follows:

   EQUITY ONE (LOUISIANA PORTFOLIO) LLC
   c/o Regency Centers Corporation
   One Independent Drive
   Suite 114
   Jacksonville, Florida 32202-5019
   Attention: Lease Administration

2. _Tenant._ The name and address of Tenant are as follows:

   Rouse's Enterprises, L.L.C.
   c/o Donald J. Rouse, Jr.
   1301 St. Mary Street
   Thibodaux, Louisiana 70301

3. _Date of Lease._ The Lease is dated as of the Effective Date.

Gardere01 - 10218612



4. **Rent Commencement.** Tenant's obligation to pay Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes, and Insurance commenced on the Commencement Date.

5. **Commencement Date.** The Effective Date.

6. **Term.** The Term of the Lease shall consist of the following:

   (a) **Initial Term.** An initial Term of One Hundred Twenty (120) full calendar months commencing on the Commencement Date.

   (b) **Extended Term(s).** Tenant may, at its option, extend the Term beyond the initial Term for five (5) separate extended periods of five (5) years each.

7. **Premises.** Landlord has leased to Tenant, and Tenant has leased from Landlord, the premises labeled Unit or Space 1 and designated as the Premises on Exhibit "B-2" of the Landlord's Building depicted on Exhibit "B-1" and consisting of the space thereat within the walls, structural floor and the bottom of the roof of the Landlord's Building.

8. **Shopping Center.** The Shopping Center is depicted on Exhibit "B-1" and consists of the land described on Exhibit "A" and improvements thereon.

9. **Competing Business; Prohibited Use.** Article 27 of the Lease establishes Tenant's exclusive use rights and certain prohibited uses with respect to the Shopping Center, the pertinent parts of which are hereinafter reprinted:

## "ARTICLE 27. COMPETING BUSINESS; PROHIBITED USE

27.1     Landlord covenants and agrees that, except for the Premises, after the date of this Lease it shall not lease, rent or occupy (including the sale or other transfer to a third party) or permit any premises in the Shopping Center to be occupied for a Competing Business or Prohibited Use (both as defined herein) (collectively, the "Restricted Uses").

27.2     The term "Competing Business" shall mean any occupant (other than Tenant) whose primary business is: (a) a full-service retail grocery supermarket, which shall mean a business engaged in all of the following: the sale of fresh-cut meats and seafood, fresh produce, dairy products and a full line of packaged food items; (b) a bakery, which shall mean a business whose premises is primarily devoted to the sale of baked goods for off-premises consumption, which baked goods are freshly baked on-premises; or (c) butcher, meat market or any other tenant whose premises is devoted to the sale for off-premises consumption of fresh-cut meats, seafood, and cheeses, or some combination thereof (including pre-packaged items), is greater than twenty-five percent (25%) of the sales area of such premises. For purposes of this Lease, the term "Competing Business" shall not include: (i) any store (including any pharmacy other than a CVS or Walgreens and their respective successors and assigns), which sells such competing items, provided such competing items do not exceed ten percent (10%) of its sales area as to any single category or twenty percent (20%) in the aggregate; (ii) CVS or Walgreens (and their respective successors and assigns) pharmacy, which sells such competing items, provided such competing items do not exceed fifteen percent (15%) of its sales area as to any

2

East Baton Rouge Parish Clerk of Court
East Baton Rouge Parish Clerk of Court

single category or thirty percent (30%) in the aggregate; (iii) any restaurant (including, without limitation, bakery concept, delicatessen or sandwich shop type restaurants such as, by way of example only, Panera Bread, Atlanta Bread, Corner Bakery, Jason's Deli or Jimmy John's); (iv) any coffee shops (including, without limitation, Starbucks); (v) any donut shop (including, without limitation, Dunkin' Donut or Krispy Kreme); or (vi) any pet store or bakery (including, without limitation, Petco, Unleashed by Petco or Pet Supermarket).

27.3    The Restricted Uses shall automatically terminate and be of no further force or effect (i) should this Lease be assigned, other than as a result of a Transfer that Landlord consents to under Section 17.1 or a Permitted Transfer under Section 17.4, or (ii) if the use of the Premises is otherwise changed (or if operations cease) from the use set forth in Section 1.1 (j) of this Lease.

27.4    If Landlord violates the Restricted Uses and such violation is not cured within thirty (30) days following Tenant's written notice to Landlord of such violation (the expiration of such 30-day cure period being the "Violation Date"), then provided Tenant is not in default in the performance of any of its obligations under this Lease beyond the applicable notice and cure periods, Tenant shall have the right to reduce Minimum Rent only by fifty percent (50%) as of the Violation Date and, subject to the remainder of this paragraph, continue such Minimum Rent reduction until the earlier of (i) the date such violation has been cured, (ii) the expiration of the then-existing Term for a violation of the Restricted Uses other than a violation of Section 27.2(a), or (c) the expiration of the Term for a violation of Section 27.2(a). The remedies set forth in this paragraph are Tenant's sole and exclusive remedies in the event Landlord violates the Restricted Uses, and Tenant hereby expressly waives any other rights and remedies available to it under this Lease, at law or in equity. Notwithstanding the foregoing, Tenant, in its sole discretion, shall be entitled to seek injunctive relief to a violation of its Prohibited Uses as an alternative to its rent reduction remedy set forth above. In the event Tenant is unable to obtain such injunctive relief, Tenant shall be entitled to elect or re-elect to exercise its rent reduction remedy set forth above. Nothing contained herein is intended to limit in any manner Tenant's obligation to pay all Additional Rent required by this Lease.

27.5    The term "Prohibited Use" shall mean:

(a)    A wholesale membership club or warehouse or any dollar store;

(b)    Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any building on the Shopping Center, with the exceptions of restaurants with outdoor seating and outdoor sidewalk sales, food preparation and any other promotional events at the Shopping Center.

(c)    An operation primarily used as a storage warehouse operation and any manufacturing, refining, smelting, agricultural or mining operation.

(d)    Any "second hand" store, "surplus" store, or pawn shop (provided however, that this restriction shall not apply to stores typically found in first class shopping centers that sell reconditioned merchandise such as "Once Upon a Child", "Play It Again Sports" and "Plato's Closet", as the same typically operate as of the date of this Lease).

3

East Baton Rouge Parish Clerk of Court.

(e)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(f)     Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any building.

(g)     Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(h)     Any dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to a cleaners or nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located.

(i)     Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation (provided, however, that this restriction shall not apply to stores or businesses such as such as automotive parts stores (e.g., Advanced Auto, O'Reilly's Auto Parts, NAPA Auto Parts, etc.), retail tire stores, automotive service facilities, such as brake replacement, muffler replacement, oil changes, car wash or other automotive service facilities)

(j)     Any skating rink, casino, truck stop, video poker outlet or other commercial use with any type of video poker, off track gaming or gambling or any other type gaming or gambling operations, except for a restaurant.

(k)     Any mortuary or funeral home.

(l)     Any establishment selling or exhibiting "obscene" material.

(m)    Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude dancers or wait staff.

(n)     An establishment for the consumption of alcohol except for (i) any restaurant/bar which derives no more than 50% of its revenues from the sale of alcohol, (ii) a wine bar, (iii) a brew pub or establishment specializing in craft beer (such as "World of Beer" or "Brass Taps"); or (iv) any coffee shop which sells alcohol as part of its use such as Starbucks.

(o)     Any massage parlor or similar establishment (provided however, that this restriction shall not apply to a first-class day spa or any legitimate massage facility operating in a manner generally consistent with an establishment such as "Massage Envy").

(p)     Any health spa, fitness center or workout facility exceeding 3,500 square feet in any of spaces H through P or T through W on the Site Plan.

(q)     Any flea market, video arcade, pool or billiard hall, or dance hall, except as part of a restaurant.

4

(r)   Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on site employee training by an occupant incidental to the conduct of its business at the Shopping Center (provided, however, this restriction shall not apply to "Sylvan Learning Center", "Kumons", "Mathnasium", and similar tutoring/educational services concept nor shall this restriction apply to any childcare or play centers, gyms, fitness centers or other workout facilities).

(s)   Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall, except as part of a restaurant. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the occupant.

(t)   Any Izzo's Illegal Burrito restaurant.

27.6   Notwithstanding anything to the contrary in this Article, (i) if the Restricted Uses shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant") then Landlord shall not be deemed to have violated the Restricted Uses and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant; and (ii) Landlord shall not be obligated to maintain or enforce the Restricted Uses under this Article to the extent the same would cause a violation of any applicable anti-trust law.

27.7   Notwithstanding the foregoing, the provisions of this Article 27 shall not apply with respect to rights previously granted to tenants or occupants (including any assignee, sublessee or other transferee thereof) under leases or agreements existing as of the date hereof (collectively "Existing Leases") for only so long as such Existing Leases continue in full force and effect and only to the extent such Existing Leases permit (or fail to prohibit) such Restricted Uses.  Landlord agrees not to amend any Existing Leases to permit the Restricted Uses if (i) Landlord has the right to do so under the terms of any such lease, and (ii) by doing so Landlord shall not be in breach or default under the terms of any such lease.  Landlord warrants and represents that all of the Existing Leases and the uses permitted thereunder are listed on Exhibit "J" attached hereto."

10.   Termination.  Upon expiration of the Term or an earlier termination of the Lease pursuant to the provisions of the Lease, Landlord and Tenant agree to promptly execute and record an instrument declaring that the Lease has terminated pursuant to La. R.S. 9:2742(D)(1).

11.   Definitions; Effect on Notice.  All capitalized terms in this Notice, unless otherwise defined or modified herein, shall have the same meaning as set forth in the Lease.

12.   La. R.S. 9:2742.  This Notice of Lease is executed for the purposes of recordation in the Conveyance Office, Parish of East Baton Rouge, State of Louisiana, pursuant to La. R.S.

5

East Baton Rouge Parish Clerk of Court

9:2742.   The Lease sets out specifically the rents, terms, covenants and conditions between Landlord and Tenant.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly signed, sealed and executed this Notice in the presence of the subscribing witnesses and notary public on May ___, 2017.

WITNESSES                                   LANDLORD:

                                            EQUITY ONE (LOUISIANA PORTFOLIO)
                                            LLC, a Florida limited liability company

                                            By:   Louisiana Holding LLC,
                                                  a Florida limited partnership
Print Name: ___Lies Elliott___                    Its:   Sole Member

                                                  By:   Regency Centers, L.P.,
                                                        a Delaware limited partnership
Print Name: ___ALIF MARIA___                            Its:   Managing Member

                                                        By:   Regency Centers Corporation,
                                                              a Florida corporation
                                                              Its:   General Partner

                                            By: 
                                                  Name:   Patrick Knox
                                                  Title:   Senior Vice President

_____
NOTARY PUBLIC

SHEZRA ROBERSON
My Notary ID # 126131307
Expires December 2, 2019

6

IN WITNESS WHEREOF, the parties have duly signed, sealed and executed this Notice in the presence of the subscribing witnesses and notary public on May 16, 2017.

WITNESSES                                    TENANT:

                                             Rouse's Enterprises, L.L.C., Louisiana limited
                                             liability company

_Celeste Hidalgo_
Print Name: Celeste Hidalgo                  By: _____
                                                 Donald J. Rouse, Jr.
                                                 Manager
_Penny Thibodeaux_
Print Name: Penny Thibodeaux

                    _____
                    NOTARY PUBLIC

                    TIMOTHY S. KEARNS
                    Notary Public
                    Notary ID No. 015415
                    LAFOURCHE PARISH, LOUISIANA

East Baton Rouge Parish Clerk of Court
East Baton Rouge Parish Clerk of Court

**EXHIBIT A**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

[Attached]

East Baton Rouge Parish Clerk of Court

East Baton Rouge Parish Clerk of Court

## LEGAL DESCRIPTION

### TRACT I

One (1) certain tracts or parcels of ground located in Section 58 and 59, T8S, R1E, East Baton Rouge Parish, Louisiana, designated as TRACT "A-1", as shown on the official recorded subdivision map entitled "Final Plat of Tracts A, B and C, being the Resubdivision of "C-2-A", "C-2-B" and Tract "D", Formerly Known as the Lewis Gottlieb Tract Located in Sections 58 and 59, T8S, R1E, Greenaburg Land District, East Baton Rouge Parish, Louisiana for Roger H. Ogden and James E. Maurin - 1981B, A Louisiana Partnership in Commendam" which map is dated May 27, 1983, as first revised November 30, 1983 and second revised January 16, 1984, recorded as Original 139, Bundle 9651, official records of East Baton Rouge Parish, Louisiana, being the same property described on a survey map by Evans-Graves Engineers, Inc., Drawing No. 40-D-1 dated December 12, 1994, (the "Survey"), as follows:

Commence at the intersection of the northerly right of way line of Bluebonnet Boulevard and the easterly right of way line of Perkins Road, proceed North 28°26'57" East a distance of 257.00 feet to the Point of Beginning; thence North 61°33'03" West a distance of 215.00 feet to a point and corner; thence North 28°26'57" East a distance of 85.00 feet to a point and corner; thence South 61°33'03" East a distance of 215.00 feet to a point and corner; thence South 28°26'57" West a distance of 85.00 feet to the Point of Beginning.

### TRACT II

A certain tract or parcel of land located in Sections 58 & 59, T8S, R1E, East Baton Rouge Parish, Louisiana, designated as Tract C-2, on a subdivision map prepared by Edward E. Evans & Associates, Inc. dated December 3, 1982, last revised July 17, 1985, a copy of which is recorded as Original 627, Bundle 9769 of the official records of the Parish of East Baton Rouge, Louisiana, consisting of 8.20 acres, and in accordance with the Survey, as follows:

Commencing at the intersection of the northerly right-of-way of Bluebonnet Boulevard and the easterly right-of-way line of Perkins Road; Thence North 28°26'57" East along the right of way line of Bluebonnet Boulevard, a distance of 342.00 feet to the Point of Beginning; Thence North 61°33'03" West, a distance of 215 feet to a point; Thence South 28°26'57" West, a distance of 323.59 feet to a point on the easterly right of way line of Perkins Road; Thence North 55°25'22" West, along the right of way line of Perkins Road a distance of 30.17 feet to a point; Thence North 28°26'57" East, a distance of 275.37 feet to a point; Thence North 61°33'03" West, a distance of 202 feet to a point; Thence South 28°26'57" West, a distance of 241.66 feet to a point on the easterly right of way line of Perkins Road; Thence North 46°02'20" West along the right of way line of Perkins Road a distance of 31.13 feet to a point; Thence North 28°26'57" East, a distance of 468.00 feet to a point; Thence North 61°33'03" West, a distance of 176.01 feet to a point; Thence South 28°26'57" West, a distance of 14.00 feet to a point; Thence North 61°33'03" West, a distance of 18.00 feet to a point; Thence South 28°26'57" West, a distance of 26.00 feet to a point; Thence North 61°33'03" West, a distance of 25.00 feet to a point; Thence South 28°27'06" West, a distance of 348.95 feet to a point on the easterly right of way line of Perkins Road; Thence North 39°14'20" West, along the right of way line of Perkins Road a distance of 38.04 feet to a point; Thence North 28°27'06" East, a distance of 634.76 feet to a point; Thence South 62°26'19" East, a distance of 253.83 feet to a point; Thence South 76°31'16" East, a distance of 213.95 feet to a point; Thence South 28°26'57" West, a distance of 40.81 feet to a point; Thence North 84°46'46" East, a distance of 265.16 feet to a point; Thence South 28°26'37" West, a distance of 16.69 feet to a point; Thence South 61°33'03" East, a distance of 50.00 feet to a point on the northerly right of way line of Bluebonnet Boulevard; Thence South 28°26'57" West, along the right of way line of Bluebonnet Boulevard, a distance of 598.62 feet to the Point of Beginning.

LESS AND EXCEPT: Those certain tracts or parcels described as Parcels 6-2-A-1 and 6-2 on that certain plat of survey prepared by J. Stephen Melton as described in that Amended Order of Expropriation and Receipt dated May 9, 2003 recorded May 15, 2003 in Original 549, Bundle 11474 of the records of East Baton Rouge, Parish, Louisiana.

**EXHIBIT B**

**PART 1 – SITE PLAN OF THE SHOPPING CENTER
(DESIGNATING THE "LANDLORD'S BUILDING")**

The site plan is presented solely for the purpose of identifying the approximate location and size of the improvements in the Shopping Center. Subject to the terms and conditions of this Lease, building sizes, dimensions, access and parking area, existing tenant locations and identities are subject to change without notice and at Landlord's discretion. Unit numbers as indicated are not necessarily the actual suite numbers and are intended for use as a reference only. Without limiting any other specific designations set forth on the site plan as of the date of this Lease, those buildings depicted below which are either designated with the letters "NAP" (i.e., not a part) or are not shaded shall not be considered a part of Landlord's Building.

[Attached]

East Baton Rouge Parish Clerk of Court

East Baton Rouge Parish Clerk of Court

LANDLORD'S BUILDING

East Baton Rouge Parish Clerk of Court

## EXHIBIT B

### PART 2 - LEASING PLAN
### (DESIGNATING THE "PREMISES")

*The site plan is presented solely for the purpose of identifying the approximate location and size of the improvements in the Shopping Center. Subject to the terms and conditions of this Lease, building sizes, dimensions, access and parking area, existing tenant locations and identities are subject to change without notice and at Landlord's discretion. Unit numbers as indicated are not necessarily the actual suite numbers and are intended for use as a reference only. Without limiting any other specific designations set forth on the site plan as of the date of this Lease, those buildings depicted below which are either designated with the letters "NAP" (i.e., not a part) or are not shaded shall not be considered a part of Landlord's Building.*

[Attached]

East Baton Rouge Parish Clerk of Court



Recording Requested By and
When Recorded, Return to:

David L. Lansky
Clark Hill PLC
14850 North Scottsdale Road
Suite 500
Scottsdale, Arizona 85254

ORIG: 515  BNDL: 12835
8/24/2017 9:22:34 AM
FILED AND RECORDED
EAST BATON ROUGE PARISH, LA
DOUG WELBORN
CLERK OF COURT AND RECORDER

COMMON OPERATION

AND RECIPROCAL EASEMENT AGREEMENT

FOR THE ARLINGTON MARKETPLACE

BATON ROUGE, LOUISIANA

1205559v.2



East Baton Rouge Parish Clerk of Court

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| ARTICLE 1  : DEFINITIONS | 2 |
| ARTICLE 2  : EASEMENTS | 6 |
| ARTICLE 3  : COMMON AREAS | 12 |
| ARTICLE 4  : DEVELOPMENT CONTROL | 14 |
| ARTICLE 5  : PARCEL CONSTRUCTION | 18 |
| ARTICLE 6  : MANAGEMENT | 24 |
| ARTICLE 7  : ASSESSMENTS | 29 |
| ARTICLE 8  : INDEMNIFICATION AND INSURANCE | 31 |
| ARTICLE 9  : SIGNS | 34 |
| ARTICLE 10 : CONDEMNATION | 36 |
| ARTICLE 11 : RESTRICTIONS | 36 |
| ARTICLE 12 : ENFORCEMENT | 38 |
| ARTICLE 13 : TRANSFER | 39 |
| ARTICLE 14 : DECLARANT'S RIGHTS | 41 |
| ARTICLE 15 : PLATTING | 43 |
| ARTICLE 16 : TERM OF AGREEMENT | 43 |
| ARTICLE 17 : AMENDMENT | 44 |
| ARTICLE 18 : MISCELLANEOUS | 44 |

1205559v.2

East Baton Rouge Parish Clerk of Court

## COMMON OPERATION AND
## RECIPROCAL EASEMENT AGREEMENT FOR
## THE ARLINGTON MARKETPLACE

THIS COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT FOR ARLINGTON MARKETPLACE (this "Agreement") is made as of the 28th day of July, 2017, by EVT BATON ROUGE LOUISIANA, LLC, a Louisiana limited liability company ("Declarant").

### RECITALS

A.    Declarant is the owner and developer of real property situated in East Baton Rouge Parish, Louisiana, more particularly described on Exhibit "A" attached hereto (the "Development").

B.    A portion of the Development is more particularly described on Exhibit "B" attached hereto (the "Rouses Parcel").

C.    A conceptual site plan for the Development is attached hereto as Exhibit "C" (the "Site Plan").

D.    Declarant intends to cause the Development to be developed and operated as a portion of an integrated shopping center on the terms and conditions herein set forth.

E.    Fee simple title to all or portions of the Development may from time to time hereafter be transferred to third parties, and prior thereto, Declarant wishes (i) to establish and subject each and every portion of the Development to the easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards hereinafter set forth, (ii) to provide for the use and maintenance of the Development as a portion of an integrated shopping center, and (iii) to enhance and protect the value and desirability of the Development by encouraging the development of attractive improvements at appropriate locations, preventing haphazard or inharmonious development, assuring adequate pedestrian and vehicular ingress, egress and circulation throughout the Development and to and from adjacent public rights-of-way, providing for adequate on-site parking, on-site loading and on-site drainage facilities, assuring the installation and maintenance of attractive landscaping, assuring appropriate lighting, and otherwise regulating the development, use and operation of the Development.

NOW, THEREFORE, it is declared, on behalf of all present and subsequent Owners (as hereinafter defined), that the Development and all portions thereof are now held and from and after the date hereof will be acquired, held, conveyed, hypothecated, encumbered, leased, used, occupied and improved subject to the following easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards, all of which are declared to be in furtherance of a plan for the mutual and reciprocal benefit, common use and enjoyment, improvement and sale of the Development and all portions thereof, and which are established for the purpose of enhancing and protecting the value of the Development as a whole, as follows:

1205559v.2

## AGREEMENTS

### ARTICLE 1
### DEFINITIONS

When used in this Agreement, the following capitalized terms have the following meanings:

1.1    "Building" means a building or other structure intended for occupancy and constructed or to be constructed from time to time on a Parcel.

1.2    "Building Envelope" means that area of a Parcel within which Buildings may be constructed, as shown on the Site Plan, in Secondary CC&R's, or as otherwise designated by EVT (as hereinafter defined) in a written supplement to this Agreement signed and recorded by EVT while EVT is the Owner of such Parcel, provided that the Building Envelope on the Rouse's Parcel shall not be altered or modified without Rouses' prior written consent .

1.3    "Circulation Drives" means those driveway corridors designated as Circulation Drives on the Site Plan including, without limitation, any immediately adjacent sidewalk, walkways, curbs, gutters and similar improvements appurtenant thereto. The Circulation Drives are intended to be paved and used for purposes of vehicular and pedestrian access, ingress and egress. EVT reserves the right at any time, and from time to time, to designate which portions of the Development constitute Circulation Drives as to all or any portion of the Development then owned in fee by EVT, subject to the limitations applicable to the Rouses Circulation Drives. Notwithstanding anything to the contrary in this Agreement, Rouses' prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned) shall be required for (a) any alteration or modification to the location of the Circulation Drives; or (b) any closure of a Circulation Drive, other than temporary closures for maintenance and repair.

1.4    "Circulation Drive Lights" means the lights, including light poles and standards, upon or in the vicinity of and primarily intended to illuminate the Circulation Drives as determined from time to time by EVT.

1.5    "City" means the city of Baton Rouge, Louisiana.

1.6    "Common Areas" means those portions of the Development (outside exterior walls of Buildings) that are available, under this Agreement, for the nonexclusive use, convenience and enjoyment of all Owners and their Permittees, including the Circulation Drives and those portions of the Development intended from time to time for use as parking areas, landscaped areas, sidewalks, walkways, roadways, City mandated pedestrian plazas or public seating, and ingress and egress to and from public rights-of-way.  Common Areas do not include loading, docking, delivery or service areas or facilities, drive-up or drive-through lanes and/or facilities located on a Parcel, exterior areas for dispensing automotive fuel located beneath a gas or similar canopy located on a Parcel, secured exterior areas of a public storage facility, fenced exterior play yard areas of an educational or child care facility, patio seating or similar exterior

2

1205559v.2

areas for outside dining, or any portion of a Parcel expressly excluded from Common Areas on the Site Plan, in Secondary CC&Rs, or as otherwise designated by EVT in a written supplement to this Agreement executed and recorded by EVT while EVT is the Owner of such Parcel. Common Area access may be restricted by EVT in respect of washes and natural open spaces that are deemed Common Areas or that are Retention Areas (defined below). Notwithstanding anything to the contrary in this Agreement, the following shall require the prior written consent of Rouses, which consent shall not be unreasonably withheld or delayed, (a) any change to the Common Areas (located outside of Rouses Protected Area (as shown on the Site Plan)) which would have a material, adverse and permanent effect on access to or visibility of the Building on the Rouses Parcel from Lee Drive, (b) any permanent changes to Common Areas of the within Rouses Protected Area, or (c) changes to the critical curb cuts of the Development shown on the Site Plan, the turn lanes into and out of the Development on Lee Drive or Burbank Drive or the traffic signal located on Lee Drive shown on the Site Plan; provided, however, if governmental authorities having jurisdiction require modifications to the items described in this clause (c), the Declarant shall give Rouses reasonable advance notice of such mandate and the opportunity to challenge such mandate in the Declarant's name or Rouses' name, in either case at Rouses' sole cost and expense, in the event Rouses determines such mandate adversely affects Rouses or its business, and Declarant shall reasonably cooperate with Rouses thereafter.

1.7    "Constant Dollars" means the present value of the dollars to which such phrase refers.  An adjustment shall occur on January 1 of the sixth (6th) calendar year following the date of this Declaration, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which this Agreement is dated; the "Current Index Number" shall be the level of the Index for the month during which this Agreement is dated of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average, published by the United States Department of Commerce (base year 1982-84 = 100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then Declarant shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

1.8    "Declarant" means EVT BATON ROUGE LOUISIANA, LLC, a Louisiana limited liability company, or its successor duly authorized under this Agreement.  Any right or easement granted to or reserved in favor of Declarant also runs in favor of the agents, employees and contractors of Declarant designated by Declarant.

1.9    "Default Rate" means the lesser of (a) fifteen percent (15%) per annum, or (b) five percent (5%) per annum plus the discount rate prevailing on the twenty-fifth (25th) day of the month preceding the date such payment was due, as established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act as is now or hereafter in effect from time to time.

3

1205559v.2

**EXHIBIT "D"**

Use Restrictions

No use shall be permitted on the Development which is inconsistent with the operation of a first class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted on the Development:

(A)    A discount department store, a wholesale membership club or warehouse or any dollar store;

(B)    Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any building on the Development.

(C)    An operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation.

(D)    Any "second hand" store, "surplus" store, or pawn shop; provided, however, that this restriction will not apply to a first-class retailer such as My Sister's Closet, My Sister's Attic or Computer Renaissance or prohibit the sale of used merchandise or reconditioned merchandise in connection with the sale of new merchandise by merchants such as GameStop.

(E)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(F)    Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any building.

(G)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(H)    Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to an on-site hydrocarbon closed loop (or other governmentally approved) system cleaner or nominal supportive facilities for on site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Development is located.

(I)    Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation.

D-1

East Baton Rouge Parish Clerk of Court

(J)   Any bowling alley or skating rink.

(K)   Any hotel, motel, short or long term residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms.

(L)   Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops.  Notwithstanding the foregoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; the boarding of pets as a separate customer service shall be prohibited; all kennels, runs and pens shall be located inside the building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the floor area of the pet shop.

(M)   Any mortuary or funeral home.

(N)   Any establishment selling or exhibiting "obscene" material.

(O)   Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff.

(P)   Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on premises consumption exceeds fifty percent (50%) of the gross revenues of such business (with the exception of (i) restaurants such as Applebee's, O'Charley's, Ruby Tuesday or other similar restaurants, (ii) a wine bar, and (iii) a micro-brewery).

(Q)   Any massage parlor or similar establishment (but this restriction will not prohibit a Massage Envy or similar first class massage establishment or massage services by a doctor, chiropractor, nurse or physical therapist or massage services offered by a licensed massage therapist in connection with the operation of a beauty parlor, day spa, hair salon, barber shop or permitted tanning, health or exercise studio).

(R)   Any health spa, fitness center or workout facility exceeding three thousand five hundred (3,500) square feet of floor area.

(S)   Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall (but this restriction will not prohibit (i) incidental patron dancing in connection with the operation of an otherwise permitted restaurant, or (ii) an otherwise permitted restaurant from having up to three billiards tables and/or up to seven video or pinball entertainment games).

D-2

1205559v.2

(T)    Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to (i) on site employee training by an occupant incidental to the conduct of its business at the Development, or (ii) the operation of a specialty educational facility such as, by way of example, Kumon, Sylvan Learning Center or Mathnasium, provided the same does not adversely affect Buyer's ability to obtain a liquor license for its grocery store.

(U)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the occupant.

(V)    Any gas station and/or other facility that dispenses gasoline, diesel or other petroleum products as fuel.

(W)    Any regional burrito restaurant (except with the written permission of Rouses).

D-3

FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON, L.L.P.

201 ST. CHARLES AVENUE
46TH FLOOR
NEW ORLEANS, LOUISIANA 70170-4600
(504) 586-5252
FAX (504) 586-5250

LORETTA G. MINCE
PARTNER
(504) 586-5273 DIRECT
LMINCE@FISHMANHAYGOOD.COM

April 24, 2012

**Via E-Mail**

Randal R. Cangelosi, Esq.
Kean Miller LLP
P.O. Box 3513
Baton Rouge, LA 70821

    Re:    *K&F Restaurant #1, L.L.C., et al. v. Patrick Dartez*
        15 JDC, Lafayette Parish, Docket No. 2012-0931, Div. "C"

Dear Mr. Cangelosi,

    I represent Rouse's Enterprises, L.L.C., and write in response to your letter of April 9, 2012, addressed to Thomas Rouse.

    Rouse's terminated Mr. Dartez's employment on February 17, 2012.

    In addition, we have investigated this matter, and we do not believe that any of the information contained in the notebook that was apparently retained by Mr. Dartez after he left the employ of your client was ever utilized by Rouse's in connection with its burrito station. You should also know that Mr. Mohl was terminated for cause on February 3, 2012.

    I suggest that you and I schedule a meeting to discuss this matter further. At that meeting, I will bring a copy of the documents showing the front-of-house recipes used by Rouse's.

    I look forward to hearing from you.

Sincerely,

Lori G. Mince

LGM/vlc

458734v.1



**FishmanHaygood**

Fishman Haygood LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
fishmanhaygood.com

Sterling Scott Willis
d: 504.586.5264
swillis@fishmanhaygood.com

April 18, 2016

**VIA EMAIL**
**(robbv@robertevanslaw.com)**

File No.  2083-04

Robert B. Evans, III
The Evans Law Corporation
3421 North Causeway Boulevard
Suite 201
Metairie, Louisiana  70002

Re:   *Izzo's Illegal Burrito v. Rouse's*

Dear Mr. Evans:

We represent Rouse's Enterprises, L.L.C., Donald J. Rouse, Jr., Donald J. Rouse, Sr., Thomas B. Rouse and Allison Rouse Royster. We have reviewed the Petition for Damages filed by K&F Restaurant Holdings, Ltd. d/b/a Izzo's Illegal Burrito, et al filed against our clients in the 19th Judicial District Court, East Baton Rouge Parish, Louisiana, Case No. 647554. Further, we are in receipt of the press release your office published on April 15, 2016, with respect to the lawsuit.

The factual allegations in the lawsuit as well as almost every factual statement in the press release are completely without basis and are injurious to each of our individual clients and to their family owned enterprise, Rouse's Enterprises, L.L.C. Our clients intend to address the lawsuit in time, and we will seek to hold your clients liable for the scurrilous allegations in the lawsuit.

For immediate attention, however, is the damage being inflicted on our clients because of the false statements set forth in your press release. These statements by you are damaging to each of the Rouse's individually and to the Rouse company as a whole. First, despite the allegation in the first sentence of the press release, Rouse's never used Izzo's proprietary recipe in its business operations. Second, the recipe book that was brought on the Rouse's location without Rouse's knowledge or approval was not located at the burrito bar but was in a separate kitchen. Upon learning that a former Izzo's employee had brought this book onto Rouse's property without Rouse's permission, the employee was promptly terminated.

Despite your allegations in the second paragraph of the press release, Rouse's never used coercive tactics with property owners. Instead, Rouse's follows a justifiable policy to locate only

1029826v.1



April 18, 2016
Page 2

FishmanHaygood

in shopping centers where it will not be at risk of baseless allegations from competing businesses.

Our clients hereby demand an immediate retraction of the press release. This letter is being sent with a full reservation of rights, and our clients intend to hold each of your clients, your law firm, and you individually, responsible for all damages it has suffered as a result of your defamatory statements.

Yours very truly,

Sterling Scott Willis
Partner

SSW\meb
cc:   James R. Swanson, Esq.
      Donald J. Rouse, Sr.
      Thomas B. Rouse
      Donald J. Rouse, Jr.
      Allison Rouse Royster

1029826v.1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| K&F RESTAURANT HOLDINGS, LTD | * CIVIL ACTION NO. 16-293 |
| IZZO'S ILLEGAL BURRITO; | * |
| K&F RESTAURANT OPERATIONS, LLC; | * |
| G&O PIZZA HOLDINGS, LTD d/b/a LIT PIZZA; | * JUDGE J.W. deGRAVELLES |
| G&O RESTAURANT OPERATIONS, LLC; | * |
| OSVALDO FERNANDEZ; and | * MAG. ERIN WILDER-DOOMES |
| A. GARY KOVACS | * |
| | * |
| Versus | * |
| | * JURY TRIAL |
| DONALD J. ROUSE, JR.; DONALD J. ROUSE, SR.; | * |
| THOMAS B. ROUSE; ALLISON ROUSE ROYSTER; | * |
| and ROUSE'S ENTERPRISES, L.L.C. | * |

**************************************************************************

### AFFIDAVIT OF PATRICK DARTEZ

Before me, Notary Public, did come and appear, Patrick Dartez, who did depose and say the

following to wit:

1. I am of the full age of majority and resident of the State of Louisiana, Parish of East Baton Rouge.

2. I was formerly the Manager of Izzo's Illegal Burrito in Lafayette.

3. After my employment with Izzo's, I was familiar with the Izzo's recipes and specialty cooking practices of Izzo's.

4. I kept a copy of Izzo's Recipe Book and cut out the Izzo's logo from the right hand top corner of Izzo's Recipe Book.

5. My managerial experience included special training and practices on cooking and prepping food for the Burrito store. and did I not return all the confidential documents as per my agreement with Izzo's.

6. Sometime in 2011, I was approached by Jack Treuting, who represented himself to be the Director of Perishables for Rouses.

7. Jack Treuting knew that I worked for Izzo's before and asked that I bring any recipes, books or other papers that would help Rouse's develop a Burrito Bar.

8.  I started the Burrito Bar at Rouse's based upon the specialized skills, training and recipes that I learned from Izzo's. Accordingly, I set up the Burrito Bar based upon the special training, knowledge, experience and Recipe Book from Izzo's

9.  Although there were times that I did not need the Recipe Book because I remembered the Izzo's recipes, there were times that we pulled pre-made food from the shelves of the Rouse's store to make the Burritos.

10. Jack Treuting offered me a job as a Deli Manager to create a burrito bar and other hot prepared foods with my specialized knowledge, experience, training and Recipe Book.

11. The Izzo's Recipe book was behind the counter for any employee to use. There were occasions that I used the Izzo's Recipe Book to teach employees how to cook certain products.

12. I was unaware that Jack Treuting had previously asked Izzo's to locate their franchises in the Rouse's stores.

13. However, Rouse's did create a Burrito bar based upon the concept and recipes of Izzo's Illegal Burrito, using the name "Build Your Own.".

14. On a separate occasion while I was working for Rouse's, I saw Jack Treuting with a Recipe Book for Whole Foods.

15. At all times, Jack Treuting was acting as the Director of Persihables for Rouse's and he had full knowledge of the use and presence of the Izzo's Recipe Book.

16. I signed a confidentiality agreement with Izzo's not to use their recipes or trade secrets with any other company, and I violated that contract at the request of Rouse's and Jack Treuting.

17. Jack Treuting and various employees were aware that the Izzo's Recipe Book was behind the counter.

18. It appeared to me that it was common practice for Rouse's to obtain recipe other Books from other establishments, and it was no secret.

SWORN TO AND SUBCRIBED

BEFORE ME, LaKiTa V. Oliver

on this 31st of January, 2018

_Notary Public_

DOCUMENT
NOT PREPARED
BY NOTARY

2

PATRICK DARTEZ

LAKITA V. OLIVER
NOTARY PUBLIC
STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE
COMMISSIONED FOR LIFE
NOTARY ID # 53357